STATE v. SAMUEL A. PHILLIPS.[1]

August 14, 1908.

Nos. 15,627—(32).

**Larceny by Agent.**

One who is employed upon a commission basis to sell the capital stock of a corporation, and is required to report all sales, and to forward to his principal all moneys received, less his commission, is an agent, within the meaning of the statute defining larceny (section 5078, R. L. 1905).

**Same.**

Where applications for the purchase of stock are made to such an agent in the regular course of business, and the money is paid to the agent by the customer, the payment will be deemed to have been made to the principal, and the agent has no authority to fill the orders by delivering his own personal stock to the purchaser.

[1] Reported in 117 N. W. 508.

**Same.**

Such an agent, who, in the regular course of business of his agency, receives money from a purchaser of stock, and fails to report the same to his principal, and fails to deliver to his principal the money so received, but appropriates such money to his own use, with the intent to deprive his principal of the same, is guilty of larceny.

**Evidence.**

The evidence justified the jury in finding beyond a reasonable doubt that at the time the moneys described in the indictment were paid to the defendant he was acting as the agent of the Hancock Company, that the moneys were paid to him as such agent in the regular course of the agency business, and that the defendant did not report such payments to his principal, but appropriated the moneys so received to his own use with intent to deprive the owner thereof.

**Same.**

Where such an agent is charged with the larceny of money received by him for the purchase of stock, and the money was paid to him subsequent to the date of the offense as stated in the indictment, the facts constituting the contract of purchase may be shown, although the time of such contract is prior to the date of the offense as charged.

**Cross-Examination.**

The cross-examination of defendant and a witness, for the purpose of affecting their credibility, was within the reasonable discretion of the trial court.

**Instructions.**

No errors in the court's charge to the jury.

Defendant was convicted in the district court for Ramsey county, Bunn, J., of the crime of grand larceny in the first degree. The defendant sued out a writ of error from this court. Judgment affirmed.

*James R. Hickey,* and *James Schoonmaker,* for appellant.

*Edward T. Young,* Attorney General, *Richard D. O'Brien,* County Attorney, and *Patrick J. Ryan,* for the state.

LEWIS, J.

Appellant was convicted of grand larceny in the first degree under an indictment which charged that March 15, 1907, at the city of St. Paul, then and there being the agent and employee of the Hancock Company, of Boston, Mass., a corporation, and having in his possession, custody, and control, as such agent and employee certain moneys, of the value of $2,693.40, he did unlawfully and feloniously,

with intent to deprive and defraud the true owner thereof, take, appropriate, convert, and embezzle the same to his own use.

The Chicago-New York Electric Air Line Railroad Company (hereafter for convenience called the "Electric Company") was incorporated for the purpose of constructing an electric railway line between Chicago and New York, and the Co-operative Construction Company, of Chicago, Illinois (hereafter called the "Construction Company"), was under contract to build the line and take its pay in stock of that company, and in pursuance of its purpose to dispose of its stock it entered into a contract with the Western Surety & Adjustment Company, of Chicago, Illinois (hereafter referred to as the "Surety Company"), for the sale of stock in the northwestern states. For a short time appellant was the agent of the Surety Company for the sale of the stock in Minnesota and the Dakotas, with his office at St. Paul. On March 19, 1907, the Surety Company dropped out, and the Construction Company entered into a contract with the Hancock Company for the sale of its stock throughout the United States, and entered into a contract with appellant under which the agency was continued upon somewhat different terms. By the terms of the contract between appellant and the Surety Company, appellant received a salary of $36 per week and one per cent. upon all the sales of stock that should be made within his territory, whether by himself, through his own agents, or by the Surety Company. Under this contract appellant was required to devote his entire time, but the office expenses and advertising material were furnished by the company. This contract was modified so that appellant was to receive a commission of ten per cent. for himself and his agency and pay his own expenses, with the exception of advertising material, circular letters, and application blanks, which were furnished by the Hancock Company. Under this contract appellant was not required to devote his entire time to the sale of stock, but by an arrangement with his agents he agreed to pay them seven per cent. upon all time sales and eight per cent. upon all cash sales, reserving to himself three per cent. and two per cent. as the case might be. This arrangement terminated August 24, 1907.

While operating under his contract with the Surety Company, on March 14, 1907, one O. M. Scott, of Sioux City, Iowa, purchased

through appellant's agency ten shares of the capital stock of the Electric Company at the price of $40 per share. The checks were made payable to appellant, and deposited by him in a bank in St. Paul under the name of S. A. Phillips, Manager. Part of the payments were made while appellant was operating for the Surety Company, and part while he was acting for the Hancock Company. On July 16, 1907, while appellant was operating under the Hancock contract, one W. A. Fenton of Sioux City, Iowa, purchased through E. C. Benner, an agent of appellant, twenty shares of stock at the agreed price of $51 per share. The first payment was made by Fenton to Benner, and the second and third payments were made to appellant himself. On June 29, 1907, a Mr. Scoville, of Owatonna, purchased sixty shares of the stock through one W. C. Webber, an agent of appellant, paying $2,736 therefor in cash to appellant personally.

Under the arrangement between appellant and the Hancock Company, a daily report of all sales was required to be made to the company at its office in Chicago, but appellant was entitled to retain the amount of his commission. Neither one of the three sales above mentioned was ever reported by appellant, and the retention of the money by him while acting as agent of the Hancock Company is the act upon which the criminal charge against him is based.

The respective claims of the state and the defendant are as follows: On behalf of the state, the offense charged is based upon the following facts and propositions: That by defendant's contract with the Hancock Company the relation of principal and agent was created and existed for the sale of the stock of the Chicago-New York Electric Air Line Railroad Company; that, in consideration of a commission of ten per cent. and the use of the printed literature and blanks of the Hancock Company, defendant agreed to solicit purchasers of the stock of that company upon such terms and at such prices as the company should stipulate; that the applications for stock by Scoville, Scott, and Fenton were made in the usual course of business, and the money was paid by them to the defendant as the representative of the Hancock Company, and immediately upon its payment such money became the property of that corporation; and that the failure to pay it over to the company constituted an appropriation of it to his own use.

Defendant denies that he ever received any money of the Hancock Company, and claims that it conclusively appears from the record that the several transactions were of a purely private character, constituting personal sales of defendant's personal stock, and that the money received was his individually. Defendant claims that he was vested with authority by the Hancock and the Construction companies, as a part consideration for entering into the contract as their representative to make sales of stock as occasion might arise, and in any event, whether under the terms of the contract defendant was or was not vested with such authority to make personal sales of stock, that the record conclusively shows he acted in good faith and upon the belief that he was possessed of such authority, and that, if he was mistaken as to the legal effect of the transaction as between himself and his principal, there is at least no evidence of criminal intent to deprive the company of its property. Defendant further submits that in any event the only interest which the Hancock Company had in the transaction was its own commission, and, the orders for stock having been filled, defendant cannot be charged with the crime set out in the indictment.

In a very clear and analytical charge to the jury the trial court submitted the question at issue under the following heads: (1) That it must appear beyond a reasonable doubt that appellant was the agent of the Hancock Company at the time the several transactions constituting the offense charged took place; (2) that as such agent he had moneys in his possession, or under his control, which belonged to that company; (3) that appellant appropriated such money to his own use, instead of turning it over to his principal; and (4) that he did so with the intent on his part to defraud the company and deprive it of the money. The court submitted to the jury the duty of finding upon each one of these separate propositions, and instructed them that it was conceded by appellant that he was the agent of the Hancock Company at the time he appropriated the money; that it was conceded that appellant received the money from the sale of stock, and that it was admitted that he had not turned it over to the company, but had converted it to his own use; that the important question in the case was whether the sale of stock was in fact made on

behalf of the company, as contended by the state, or was a sale of the personal stock of appellant, as contended by him.

Upon the principal question of fact litigated at the trial, we are of opinion that the evidence was sufficient to justify the jury in finding beyond a reasonable doubt that the applications for the purchase of stock were made through defendant's agency in the ordinary course of business, and that the sales made in pursuance thereof were made on behalf of the company, and that the money received by defendant was the company's money. The jury were entitled to pass upon the credibility of the witnesses and to consider all the evidence, and we will refer to only a few of the circumstances which tend to throw light on the conduct of defendant during the period under consideration.

Defendant insists that he had authority to sell his own stock to the company's customers, and that he did so on these occasions. But it does not appear that at the time the applications were received defendant was possessed of the amount of stock to fill the orders. In the Scoville deal, a large portion of the stock was afterwards purchased by defendant in the open market, and it was not all delivered to Scoville until long after the money was paid in. The fact that a five per cent. discount was made to Scoville in consideration of his paying cash, and the fact that the company would make no allowance for it, does not tend to prove that defendant had authority to turn such deals over to himself when a discount to the customer was necessary to carry them through. Under defendant's contract he was allowed a commission of ten per cent. and it was within his power to make any reduction from his commission that he saw fit. Defendant also claims that he went into the market to purchase the stock with which to fill the order, and that on the entire transaction with Scoville he made $90 only, for which reason he claims to have been acting in good faith, and without any intention to take advantage, or to appropriate his principal's money. The answer to this suggestion is that the amount realized by defendant does not determine the motive with which the scheme was undertaken. The record discloses that, during the period between receiving the money from Scoville and the time the stock was delivered, defendant attempted to purchase stock in the open market in Chicago at nearly one-

half the price paid for it by Mr. Scoville, all of which indicates that it was the purpose of defendant to speculate on the possible profit to be realized by purchasing the stock to fill the order. This might have been legitimate business, if the money paid into his hands had belonged to himself; but such course of business has no tendency to prove that the money received did in fact belong to him.

Defendant testified that it was understood between the officers of the Hancock and Construction companies and himself that he should have the liberty to personally fill orders for stock, and that such was the conduct of the business for a considerable time, and was so recognized by the officers of the companies as proper. It is true defendant testified that there was such an understanding; but such an arrangement would be most unusual, for it would tend to deprive the company of the very service which it contracted to receive and for which it was paying a commission. Defendant was required to prove such authority to the satisfaction of the jury, and we are bound by the jury's conclusion as to the effect of the evidence.

It is still further claimed that the company knew defendant was engaged in private deals of this kind, and that, having knowledge of such fact, the company had an accounting and made a settlement with defendant, thereby intending to dispose of all matters in dispute growing out of such transactions. Such a settlement was denied, and the evidence in support of it is not of such clear and decisive character as to require the jury to accept it as true.

Defendant insists that, even if he were mistaken as to his authority to make personal sales, and conceding that the several transactions mentioned were in fact made on behalf of the company, yet the evidence shows that defendant was proceeding in good faith, believing that he had a right so to do, and therefore that in appropriating the money it was without any intention to deprive the owner of it. The intention with which a party acts may be inferred from what he does. In this case the trial court and the jury had before them the history of the entire case as developed by the evidence. The intent with which the money was taken and appropriated by defendant was one of the issues, and in our judgment the jury were justified in the conclusion that the defendant received the money, knowing the same to have been paid to him in the line of his duties as an

agent, and that he intentionally converted the same to his own use, and resorted to the method of filling the orders by purchasing the stock from some other sources for the purpose of securing the possible profit and at the same time escape liability to his customers.

Defendant also submits that in no event was there any embezzlement of the moneys of the Hancock Company in excess of that company's interest in the proceeds of the sales, for the reason that the stock was actually furnished to the purchasers, thereby relieving the company of that amount of loss; in other words, that the only interest which the Hancock Company had in the several sales, conceding the same to be company transactions, was the amount of the commission, and, this being true, the offense charged in the indictment is not sustained.

Upon first impression this suggestion has some force, and it is a plausible argument that, if defendant furnished the stock personally, it relieved his principal to that extent, and that the principal was not deprived of anything more than the amount of its commission. Under the common law it was not a crime for an agent to appropriate to his own use funds which came into his hands while acting for his principal; but the statutes upon this subject were gradually developed until all distinction formerly existing between an appropriation of funds by an agent and by a servant has been entirely wiped out. Our statute reads: "Every person who, with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person * * * having in his possession, custody, or control as a bailee, servant, attorney, agent, clerk, trustee," etc., "shall be guilty of larceny." Under this statute it is immaterial whether the money came into the hands of defendant as a clerk or employee, or whether it was paid to him as the result of his own efforts within the line of agency. The only interest which he had in the fund was the amount of his commission, which he was entitled to deduct. The remainder of the money was never his. Title to it passed to his principal immediately it was paid into defendant's hands. It was no concern of defendant that the company was also employed upon commission. By the terms of his contract he was to account to his

principal for all money received, less his commission, and no juggling with the funds could change the legal status of the parties.

Objection was made at the trial to the reception of evidence with reference to the purchase by Mr. Scott, which took place on March 14, 1907, prior to the time alleged in the indictment. We find no error in the rulings of the court in this respect. The charge in the indictment was for receiving moneys which belonged to the Hancock Company, and the evidence received was not for the purpose of showing any embezzlement prior to the date of the indictment, March 15. It was proper to show the origin of the transaction, even if it antedated the indictment, for the purpose of laying the foundation for proving that payments subsequently made to the defendant were made pursuant to the contract of purchase, and it conclusively appears that at the time such subsequent payments were made the Hancock Company had succeeded to all of the interests of the Construction Company. We find no ground for the suggestion that the defendant was misled by the state going into a transaction which took place before the date of the indictment. For aught that appears, defendant was fully prepared to meet any evidence in that particular.

While defendant, and one of his witnesses, Mr. Webber, were on the stand, they were cross-examined as to their connection with the St. Paul, Minneapolis & Seattle Air Line Electric Railroad Company, and it is claimed that the court erred in admitting testimony with reference to the extent of such connection. In so far as the examination of Mr. Webber is concerned, it would seem that it was carried to an unnecessary length, and we do not intend to approve of the method adopted with regard to this particular witness; but in such matters the trial court has wide judicial discretion, and we cannot find that the rule was violated. The rule is stated in Malone v. Stephenson, 94 Minn. 222, 102 N. W. 372, as follows: "The extent to which a witness may be cross-examined as to matters not relevant to the issue, for the purpose of affecting his credibility, rests largely in the discretion of the trial court. This discretion, however, should not go so far as to sanction an attempt to discredit a witness by innuendo instead of competent evidence." State v. Quirk, 101 Minn. 334, 112 N. W. 409.

We have examined the assignments of error with reference to receiving in evidence, against defendant's objection, a copy of a letter claimed to have been written by the president of the Hancock Company to the defendant, and are satisfied that under the circumstances as developed at the trial it was properly received, tending to show that the original was in possession of defendant himself.

Defendant took exception to many parts of the court's charge to the jury, and to the refusal of the court to give certain requests. The essential features which form the basis of defendant's objection to the charge have already been covered. Every request of defendant having any material relation to any issue was either given as requested or embodied in the general charge. The main defense was that the sales in question were personal, and not made on behalf of the Hancock Company. That issue formed the central point of the charge; but, in addition thereto, the court carefully and elaborately set before the jury each and every issue necessary for them to pass upon.

We find no errors.

Affirmed.