## STATE v. ANDERS GUSTAF NELSON.[1]

### March 4, 1921.

### Nos. 22,248, 22,239.

**Verdict not sustained by evidence—murder in first or second degree.**

1. Murder in the first degree involves a premeditated design to effect death, and murder in the second degree a design to effect death, but without deliberation and premeditation.  The verdict of guilty of murder in the first degree is not sustained by the evidence, and the evidence did not justify a submission of either murder in the first or in the second degree.

**Murder in the third degree or manslaughter in the first degree.**

2. Murder in the third degree may be committed, without an intent to kill, by one while engaged in the commission of a felony, and manslaughter in the first degree may be committed, without an intent to kill, by one while engaged in the commission of a misdemeanor.  The evidence was such as to justify the submission of murder in the third degree and manslaughter in the first.

**Evidence of ill feeling and threats admissible.**

3. The man killed was working at the time on a farm occupied by one Jacobson, and owned by the father-in-law of the defendant.  He was helping move.  Between Jacobson and defendant there was ill feeling, and defendant had made threats.  The trouble between them arose in connection with the farm.  It was proper to show ill feeling and threats.  Such evidence was competent as throwing light upon the occurrences imme-

[1]Reported in 181 N. W. 850.

diately attending the killing. It was not proper to go into the details of the troubles to such an extent as to divert the attention of the jury from the real issue or to substitute a false one, nor so as unjustly to prejudice the defendant by a showing of matters collateral to the real issue. The evidence should have been restricted.

## Cross-examination of defendant was not properly conducted.

4. A defendant in a criminal case who becomes a witness subjects his credibility to the usual tests and invites attack upon his character for truthfulness. The extent of the cross-examination to test credibility is largely discretionary. It may be severe. The cross-examination was directed to quarrels alleged to have been had by the defendant with others, to independent offenses committed or assumed to have been committed by him, and to quarrels with and threats against others. It was sought to discredit him by insinuation and innuendo. It is *held* that the cross-examination was not within proper limits.

## No rebuttal of party cross-examined on collateral matters.

5. When a party cross-examines a witness upon collateral matters to affect his credibility, he must accept the answers he gets and cannot contradict them on rebuttal.

## Character of defendant in respect to trait involved in the crime.

6. By becoming a witness the defendant does not put in issue his character in respect of the trait involved in the crime charged.

## Evidence of particular acts of wrongdoing inadmissible.

7. When the defendant's character in respect of a trait involved in the crime charged is in issue, the state cannot attack it by showing particular acts of wrongdoing.

## Character of defendant not put in issue by irresponsive answer.

8. The defendant did not put his character in issue when, under cross-examination, he gave an irresponsive answer to the effect that he was not a fighing man and would bring witnesses to show it, nor did such testimony subject his character to attack on cross-examination or in rebuttal by a showing of particular acts of misconduct.

## Evidence of independent crimes incompetent.

9. Evidence of independent crimes was not competent in proof of that charged.

## Misconduct of posecuting attorney.

10. The statement by the prosecuting attorney[1] that certain testimony was given before the grand jury was improper.

[1][Predecessor in office of the county attorney whose name appears on the next page. Reporter]

Defendant was indicted by the grand jury of Douglas county charged with the crime of murder in the first degree, tried in the district court for that county before Roeser, J., and a jury and found guilty as charged in the indictment. From an order denying his motion for a new trial, defendant appealed. Reversed.

*Constant Larson* and *J. D. Sullivan*, for appellant.

*Clifford L. Hilton*, Attorney General, and *R. G. Anderson*, County Attorney, for respondent.

DIBELL, J.

The defendant, Anders Gustaf Nelson, was convicted of murder in the first degree for the killing of Joe Middleton near Alexandria in Douglas county. He appeals from the order denying his motion for a new trial.

The court submitted murder in the first degree, murder in the second degree, murder in the third degree, and manslaughter in the first degree. The defendant contends that the evidence does not sustain the verdict of murder in the first degree, and that it did not justify the submission of either murder in the first or in the second degree. The particular claim is that the evidence did not show a premeditated design or any design to kill. With less confidence it is urged that the evidence did not warrant the submission of murder in the third degree. It is not much contended that there was not a question for the jury of manslaughter in the first degree. In addition it is urged that evidence of threats by the defendant against Jacobson, for whom Middleton was working, and of ill feeling towards him and his family, was erroneously received; that the cross-examination of the defendant relative to actual or suggested prior troubles with others, and of other distinct offenses, actual or suggested, extended beyond proper limits; that the character of the defendant in respect of the trait involved in the crime charged was not in issue; that in any event evidence of specific acts of misconduct affecting his character was erroneously admitted or wrongly pressed after adverse rulings, and that altogether the defendant did not have the fair trial which the law accords to one accused of crime.

1. Murder in the first degree is a killing with a premeditated design to effect death; murder in the second degree is a killing with a design to

effect death, but without deliberation and premeditation. G. S. 1913, §§ 8603, 8604.

The defendant was born in Sweden in 1867. He came from there to Alexandria in 1886. His parents came a year later. He returned to Sweden in 1888. He was in the Swedish army for two years and afterwards wandered over Norway, Denmark, Germany and England. Principally he lived in Sweden. He was employed for a number of years by an English company to look after its timber interests in Scandinavia. His duties required him, among other things which he did, to protect game against illegal hunting. He returned to the United States in 1916. He remained in the east until about Christmas, 1918, when he came to Alexandria where his mother lived. In June, 1919, he worked about the residence of Knute Nelson near the outskirts of the city. In September, 1919, he married his daughter.

Knute Nelson owned a farm just southerly of the city which was occupied by Oscar Jacobson, a nephew of his wife. Jacobson was occupying without the payment of rent, but supplied the Nelson home with milk and cream and firewood. Nelson had some of his live stock on the farm and some farm machinery. Jacobson was a good farmer and was generously treated, in part because the farm was run down and he was to put it in condition, and in part because of his kinship with the owner. The relations between the Jacobsons and the owner and his family were cordial.

It was understood that Jacobson was not to occupy the farm in the cropping season of 1920. In March he was moving to a farm a few miles away, and Joe Middleton, the man who was killed, was helping. In the forenoon of March 10, the defendant was working in the woods on the Nelson farm cutting firewood. He had his shot gun and a dog with him. About one o'clock he returned home for dinner, walking through the Nelson farm. On his way he noticed that Jacobson's horses were in the rye field. He drove them into the barnyard and closed the gate. After his noonday meal and about three o'clock he returned by the way he had come. He had his gun. It was quite a habit with him to carry a gun. He noticed that the gate was open and that the horses were in the rye field again. The gate had been opened by a daughter of the Jacobson household, so that the horses might go back to the rye. The defendant went

down into the field and drove them back. He says he loaded his gun just before he saw them and as he was on the way to the woods. It was either just before or just after.

The defendant, Herbert Jacobson, the 17-year-old son of Oscar Jacobson, and Middleton met near the granary, a short distance from the gate, as he came back. Herbert claims that the defendant asked him what business he had to open the gate; that he did not reply; that Middleton asked the defendant what business he had to shut the gate; that the defendant pointed his gun at him; that Middleton grabbed the barrel with his right hand; that a struggle followed and that the gun was discharged into the right arm and shoulder of Middleton. He gives the impression that in the struggle the defendant was trying to work the gun in the direction of Middleton. The defendant's story is different. He says that he remonstrated with Herbert about the opening of the gate; that Herbert said nothing; that he did not point the gun at Middleton; that Middleton said nothing; that Middleton, when he got near enough, grabbed the gun, pulled it away, and struck him a glancing blow on the face; that the butt hit the ground; that the breech of the gun was broken, and that the gun was discharged into Middleton's arm and shoulder. Middleton was taken to the Jacobson house and died six hours later. The defendant's face was injured and was bleeding and a finger was hurt. He claims that the injury came from the blow struck by Middleton. Herbert testifies that after the shot he picked up a rock and hit the defendant in the mouth. This information was not disclosed until the week of the trial when it was given to the prosecution. The explanation is that he was afraid to tell of it at the time.

There were two other eye-witnesses, one Beltz, and his son, a boy of 18, who were passing nearby on the road. Their opportunity for seeing was not the best. The testimony of Beltz corroborates that of the defendant. The jury might consider it weakened because of hostility between him and Jacobson. It might consider it weakened by statements made by him to others in a measure inconsistent with his testimony at the trial. The testimony of Roy Beltz, the son, corroborates the defendant. His testimony is subject to some of the infirmities which attach to that of his father. To some extent the physical facts support the defendant. There were declarations in the nature of dying declarations. Some of them were favor-

148 M.—19.

able to the state; others support the defendant. They were not made under satisfactory conditions, the accuracy of their narration is subject to question, and they are of uncertain weight.

There was ill feeling between the Jacobsons and the defendant. There was trouble in September or October about the defendant hunting in the woods on the Nelson farm. About the same time there was some wordy wrangling about Jacobson's failure to deliver wood at the Nelson home and the defendant made some wild and rambling threats. In the early part of December at the Jacobson home there was trouble about the delivery of milk. There was a physical encounter between Jacobson and the defendant, and some threats were made against him. On February 11, 1920, the defendant was about the Jacobson premises with his gun. It is claimed that he pointed it at various members of the family and made threats. From February 11 on there was no meeting of the parties and no trouble. The defendant claimed authority from the owner to look after the farm. Such as he had was indefinite. However, as he went about the farm he was not regarded as a trespasser and is not to be considered one.

The evidence is all to the effect that the gun was discharged in an encounter between the defendant and Middleton. The defendant did not know Middleton. He had no motive for killing him. It is impossible upon a fair and reasonable consideration of the competent evidence to believe that he had premeditated design or any design to effect his death, and a jury cannot be permitted to find that he had. The result represented by the verdict could not be reached upon an impartial and dispassionate consideration of the competent evidence uninfluenced by prejudicial circumstances or considerations. If there was a criminal homicide, the case is typical of a class where, in a quarrel or an affray, a wrongful but not intentional killing results.

The evidence does not sustain the jury's finding of murder in the first degree, nor is it sufficient to sustain a finding of murder in the second degree. Upon a new trial, unless the evidence is substantially different, neither murder in the first degree nor murder in the second degree should be submitted.

. 2. An intent to kill is not present in murder in the third degree nor in manslaughter in the first degree. Murder in the third degree is defined

as follows: "Such killing of a human being, when perpetrated by act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual, or without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, a felony either upon or affecting the person killed or otherwise, is murder in the third degree" * * * G. S. 1913, § 8606.

Whatever there is of uncertainty or ambiguity in the meaning of this section disappears when we look to its origin.

By R. S. 1851, c. 100, § 2, a homicide is murder in the second degree or murder in the third degree accordingly as it is committed in one or the other of these ways:

"When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree * * *

"When perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the third degree."

In the revision of 1866 murder in the second degree did not involve an intent to kill. It was defined in language corresponding to the first portion of the quoted definition of murder in the third degree, and murder in the third degree was defined in language corresponding to the latter portion. Murder in the second degree and murder in the third degree were defined as follows: "Such killing, when perpetrated by any act eminently dangerous to one or more persons, and evincing a depraved mind, regardless of the life of such person or persons, although without any design to effect death, shall be murder in the second degree * * *; when perpetrated without any design to effect death by a person engaged in the commission of any felony, it shall be murder in the third degree." G. S. 1866, c. 94, § 2; G. S. 1878, c. 94, § 2.

The penal code of 1886, § 155 (see Laws 1885, p. 311, c. 240), included within its definition of murder in the third degree what before was murder in the second degree and murder in the third degree, and gave the present definition. This is noted in State v. Brown, 41 Minn. 319, 43 N. W. 69. In other words, since the penal code murder in the third degree

may be committed in two ways. That first defined involves an unintentional killing, without a special design upon a particular person, by an act eminently dangerous to others, evincing a mind depraved and regardless of human life. See State v. Lowe, 66 Minn. 296, 68 N. W. 1094. That last defined involves an unintentional killing perpetrated by a person engaged in committing or attempting to commit a felony. The distinction noted has continued from territorial times with some changes of phraseology relative to the definition of what was once murder in the second degree.

The evidence does not suggest that the defendant was within the first portion of the definition of murder in the third degre. If he was committing or attempting to commit a felony upon Middleton and death resulted from his act while so engaged, he was guilty of murder in the third dègree. An assault in the second degree defined by G. S. 1913, § 8632, is a felony.

Manslaughter in the first degree is defined in the revision of 1905 as follows:

"Such homicide is manslaughter in the first degree when committed without a design to effect death [either]

(1) By a person engaged in committing or attempting to commit a misdemeanor or gross misdemeanor affecting the person or property. either of the person killed or of another; or

(2) In the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." R. L. 1905, § 4881; G. S. 1913, § 8608.

By Laws 1905, p. 162, c. 125, the definition of manslaughter in the first degree was changed by the addition of subdivision 3, not material here, and the words, "or gross misdemeanor," were omitted from section 1. G. S. 1913, § 8609. Without discussing the effect of this legislation. it may safely be assumed that the word "misdemeanor" is used in a generic sense to include all misdemeanors.

If the defendant was committing a misdemeanor upon Middleton, and death resulted from his act while so engaged, he was guilty of manslaughter in the first degree under subdivision 1 of the section quoted. The provision of subdivision 2, relative to the heat of passion and a killing by means of a dangerous weapon, has reference to a homicide, reduced to manslaughter in the first because committed in the heat of passion.

The evidence justified the submission of murder in the third degree and manslaughter in the first degree. We do not discuss the evidence pertaining to these two degrees of homicide. A finding of manslaughter in the first degree rather than murder in the third seems the more natural one. Still, with the evidence as it now is, a jury might find murder in the third.

3. The trouble between Jacobson and the defendant arose over matters trifling in character. It may be that Jacobson was not observing his agreement relative to the delivery of wood and milk and cream to the Nelson home. It may be that he took unkindly to the defendant coming into the Nelson family. The defendant may have been arrogant and overbearing and violent-tempered and inclined to assume authority. In any event there was ill feeling shared by both.

The shot that killed Middleton came from the defendant's gun. The state in making its case was not restricted to the naked occurrences at the time of the shooting. It was not natural that Middleton and the defendant, strangers to each other, should engage in conflict. The difficulty arose on the Jacobson farm, in the presence of one of the Jacobson family, as he and Middleton were engaged in the work of moving. The defendant was at the time assuming the right to deal with the Jacobson property. The trouble between the defendant and the Jacobsons had some relation to the farm. The prior relations between the Jacobsons and the defendant might throw light upon the trouble in which Middleton participated, and so evidence relative to threats and ill feeling was competent, whether it was unfavorable or favorable to the defendant. It was therefore proper to show that there was ill feeling between the defendant and the Jacobsons, although there could be none between the defendant and Middleton, for they were strangers. It was proper to show that the defendant had made threats against Jacobson, although he had made none against Middleton.

While the extent of the showing was in a measure discretionary, it was not proper to go into details to such an extent as to confuse the issue and to prejudice the defendant by trying the merits of the controversies between him and Jacobson. The evidence of ill feeling and threats was admissible for the purpose of explaining what occurred when Middleton was killed and of aiding the jury in its determination of the ultimate

issue; not for the purpose of obscuring the issue or substituting a false one. The state gave evidence at great length of the particulars of the trouble at the two times in September or October, 1919, of the trouble of December 4, 1919, and of the trouble of February 11, 1920. The trouble of December 4, 1919, may be taken as an example. Mrs. Jacobson and the three Jacobson children testified. If their testimony is true, the defendant made a technical assault on one of the daughters and accompanied it with vile and indecent language, and made threats and used disgusting and insulting language towards Mrs. Jacobson who was with child. Their testimony made the defendant's conduct brutal. All the facts that could have been told upon a charge of assault were narrated and the merits litigated. For his part in the trouble the defendant was convicted of assault. The troubles on the three other occasions were reviewed in somewhat the same way. Largely this evidence tended to divert the minds of the jury from the real issue, rather than to enlighten them upon it. It was of a character having a direct tendency to prejudice the defendant. Upon a new trial the prosecution should be confined to narrower limits. If the first two degrees of murder are not submitted there will be the less occasion for going into lengthy details.

4. The defendant was a witness. He could not insist upon being a stranger to the jury. His life could be somewhat inquired into. His becoming a witness put his credibility to the usual tests. He invited an attack on his character in respect of truthfulness. He did not put his character in all respects in issue. The state might submit him to a severe cross-examination to affect his credibility, and how far the state may go for such purpose is largely discretionary with the trial court. State v. Quirk, 101 Minn. 334, 112 N. W. 409; State v. Phillips, 105 Minn. 375, 117 N. W. 508; State v. McCoy, 112 Minn. 424, 128 N. W. 465. So in a larceny case it was held within the discretion of the trial court to permit the state to ask a witness, not the accused, if he had not stolen a gun since the case on trial arose. State v. McCartey, 17 Minn. 54 (76); in a murder case to ask the defendant about his gambling career, State v. Quirk, 101 Minn. 334, 112 N. W. 409; and in a civil action for an assault to permit the plaintiff to ask the defendant about an assault on another person. Campbell v. Aarstad, 124 Minn. 284, 144 N. W. 956.

Still, there is a limit. In State v. Fournier, 108 Minn. 402, 122 N. W.

329, the court said that "the limit is clearly reached and passed when questions are asked manifestly for the purpose of creating prejudice in the minds of the jurors, or the examination is carried on in such a manner or to such an extent as to become oppressive, and is not warranted by anything in the case." There the indictment was for murder. The defendant was asked whether he had not killed another man, whether he had not participated in the commission of another crime, and was submitted to a long examination reflecting on his general character. The limit was passed in State v. Taylor, 144 Minn. 377, 175 N. W. 615. There questions were asked and pressed carrying insinuations as to the character of the defendant in respects likely to affect a jury trying him for the particular crime with which he was charged. And in Malone v. Stephenson, 94 Minn. 222, 102 N. W. 372, it was said that the permitted discretion "should not go so far as to sanction an attempt to discredit a witness by innuendo instead of competent evidence."

The cross-examination of the defendant was prolonged. To some questions objections were sustained. Sometimes questions were pressed in disregard of the court's rulings. The defendant in 1887, thirty-three years before the trial, worked with a team of horses in a threshing crew near Fargo. He was asked whether his father did not claim that he stole the team. He denied that he did. An objection was sustained after the answer came in. Notwithstanding the ruling, questions relative to the team were afterwards asked in such a way as to carry along the original suggestion that there was a claim by his father that he had stolen the horses. He was asked whether he had not had trouble with Nels Floding about the same time. He answered in the negative. He was then asked, and this was after the ruling on the question about stealing the horses, whether he had not stolen wood from Floding. He answered in the negative. An objection was sustained after the answer. He was asked and permitted to answer whether he had a quarrel with one Cable, pointed a gun at him, threatened to shoot and kill him, and to carve his stomach out with a hunting knife; whether he did not tell Cable that he had killed a man; whether he had a quarrel with a police officer of Alexandria, and threatened to shoot and kill him; whether he had a quarrel with the chief of police and threatened to shoot him; whether he had trouble with a man in Alexandria because of using bad language to his daughter; whether he

did not have a gun with him on the witness stand, and whether he had not killed two men in Sweden. He was asked about a quarrel and trouble with some boys at a nearby fishing place, and generally as to threats and quarrels with others. He was asked if he did not threaten Jacobson, who failed to obey the subpoena to appear as a witness for the state, if he got on the witness stand.

The cross-examination was characterized by attempts to discredit the defendant "by sneers and innuendo," a method disapproved in State v. Clark, 114 Minn. 342, 131 N. W. 369. The conduct of the examination makes applicable the remark of the court in Gale v. People, 26 Mich. 157, that "a list of questions which assume the existence of damaging facts, may be put in such a manner, and with such persistency and show of proof, as to impress a jury that there must be something wrong even though the prisoner fully denies it, and there is no other evidence," and it suggests the likelihood that, as was said in People v. Mullings, 83 Cal. 138, 23 Pac. 229, 17 Am. St. 223, "the questions, and not the answers, were what the prosecution thought important." The cross-examination passed the permissible limits of proper cross-examination.

5. The defendant denied the charges suggested on cross-examination. To some extent the state contradicted him on rebuttal. The witness Cable testified at length about his trouble with the defendant. It arose because Cable slightly wounded one of the defendant's dogs which he mistook for a lynx and thought he was shooting. The defendant was angered. Cable stated that "he pointed the gun up to my stomach;" that he said "I killed two men once when I was gamekeeper;" and that he took out a hunting knife and said: "I kill you and myself." The testimony as to the hunting knife was stricken. The police officer testified in detail as to some trouble with the defendant because he did not have his dogs licensed, and of arresting him for driving his automobile on the wrong side of the street, and of the circumstances attending his payment of a fine, and he stated that the defendant, in the trouble over the licensing of the dogs, threatened to shoot him if he came in the yard again.

The rule is that, when a party is cross-examined as to collateral matters to affect his credibility, the cross-examiner must accept the answers he gets. Campbell v. Aarstad, 124 Minn. 284, 144 N. W. 956; Dunnell, Minn. Dig. and 1916 Supp. § 10348, and cases cited. Underhill, Crim.

Ev. § 65. Unless the testimony of the witnesses in rebuttal was admissible on other grounds, it was improperly received.

6. The state contends that it was entitled to attack the trait of character of the defendant involved in the crime charged, show his threats against others and quarrels with them and offenses against them, and that the evidence in rebuttal was competent irrespective of the cross-examination. The record shows that there was confusion as to the state's right to attack the defendant's character. The law is well settled and should be clear on a new trial.

The defendant's character in respect of the trait involved in the crime charged was not in issue. It was not competent to show his bad character, unless he put his character in issue. State v. Stone, 96 Minn. 482, 105 N. W. 187; Underhill, Crim. Ev. § 78; 1 Wharton, Crim, Ev. §§ 57, 487; 2 Bishop, New Crim. Proc. § 1112. He did not put it in issue by becoming a witness. The right to attack his credibility when he became a witness has been discussed.

Evidence of bad character is not rejected because it is logically irrelevant, and without probative force, but upon sound reasons of policy. Evidence of good character is logically and legally relevant, and evidence of bad character is of probative force. It is not legally relevant because courts, for reasons of policy, decline to hold it so. In reviewing some of the cases and stating the settled rule, Dean Wigmore says:

"This policy of the Anglo-American law is perhaps more or less due to the inborn sporting instinct of Anglo-Normandom—the instinct of giving the game fair play—an instinct which asserts itself in other departments of our trial law to much less advantage. But, as a pure question of policy, the doctrine is and can be supported as one better calculated than the opposite to lead to just verdicts. The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot help operating with any jury, in or out of court. * * * Our rule, then, firmly and universally established in policy and tradition, is that the prosecution may not initially attack the defendant's character." 1 Wigmore, Ev. § 57.

7. Again, when the defendant's character is put in issue, the state cannot rebut it by showing specific instances of wrongdoing. It must rebut

by showing bad character. 1 Wharton, Crim. Ev. § 487; 8 R. C. L. 212. The reasons which induce the rejection of evidence of specific acts is based in part on the same general policy which excludes evidence of bad character, unless the accused puts his character in issue.

"It is forbidden, in showing that the defendant has not the good character which he affirms, to resort to particular acts of misconduct by him. * * * That such former misconduct is relevant, i.e., has probative value to persuade us of the general trait or disposition, cannot be doubted * * *.

"It may almost be said that it is because of this indubitable relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The nature and inevitably tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. Moreover, the use of alleged particular acts ranging over the entire period of the defendant's life makes it impossible for him to be prepared to refute the charges, any or all of which may be mere fabrications. These reasons of auxiliary policy, directed to prevent the risks of reaching verdicts through insufficient evidence, have operated to exclude that which is in itself relevant. For more than two centuries * * * this policy, in one or another of its reasonings, has received judicial sanction more emphatic with time and experience. It represents a revolution in the theory of criminal trials, and is one of the peculiar features, of vast moment, which distinguishes the Anglo-American from the Continental system of evidence. * * * The reasons thus marshalled in various forms are reducible to three: (1) The over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) the tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses; (3) the injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated. It is also said, by some judges (4) that the confusion of new issues is a reason for avoiding such evidence. * * * The other three reasons are the vital ones." 1 Wigmore, Ev. §§ 193, 194.

8. The state seems to claim that the defendant put his character in issue by his testimony when a witness, or at least subjected himself to attack on cross-examination and in rebuttal as to quarrels and troubles with others and threats against them. When under cross-examination as to what he told one Engstran about the difficulty with Jacobson down in the woods when the trouble about hunting on the farm arose, this occurred:

"Q. At that time did you also tell Mr. Engstran you didn't have to be afraid of anyone, that you had a gun on you at that time and you would fight anybody? A. I won't fight anybody. I guess there is somebody knows me that I don't want to fight. Q. Is there? A. Yes, sir. Q. Will you get some witnesses here on the witness stand that will say you don't want to fight? A. Yes, sir, I will bring them up, that man that knows me since I come over here. (Here there was an objection but no ruling). Q. So, Mr. Nelson, you will bring men here who will testify? A. That know me since I come over and they know that I am a man that don't want to fight. Q. You will do that? A. I will bring them up too— Q. Before this jury? A. Yes, sir. Q. You agree to do that in this case? A. Yes, sir, I will."

Counsel for the defendant protested that character was not to be put in issue. The defendant was apparently angered at the cross-examination. He does not speak English accurately. It is clear that he did not always appreciate fully the questions put to him. There can be no substantial claim that the defendant's assertion that he was not a fighting man, and would bring witnesses to show that he was not, put his character in issue, or justified showing troubles with others or threats or offenses against them. See People v. Hinksman, 192 N. Y. 421, 85 N. E. 676. Were it so an irresponsive answer, as was that of the defendant, though innocently enough made, followed by a claim that he could substantiate his answer by witnesses, would put his character in issue, though his counsel was asserting all the time that it should not be so. Nor did the giving of an irresponsive answer—stating as witnesses constantly do what they claim the fact is instead of what was said—open his character to investigation on cross-examination or on rebuttal by evidence of specific acts. The trial court seems to have had in mind that evidence of bad character could not be received, but evidence on cross-examination and on rebuttal

as to specific acts was received. The defendant offered no evidence of good character and the state none of bad character.

9. The evidence received cannot be sustained upon the ground that evidence of other crimes was admissible. Evidence of independent crimes is generally incompetent. State v. Fitchette, 88 Minn. 145, 92 N. W. 527; 1 Jones, Ev. § 143; 3 Bishop, New Crim. Proc. § 628; 8 R. C. L. 198. There are exceptions, as where the facts offered show intent or motive, or guilty knowledge, or a system or scheme or plan. The exceptions are stated in State v. Monroe, 142 Minn. 394, 172 N. W. 313, and State v. Ettenberg, 145 Minn. 39, 176 N. W. 171, which go quite far. The present case is not within them. Of course evidence otherwise competent is not incompetent because it connects the defendant with an independent crime. State v. Madigan, 57 Minn. 425, 59 N. W. 490.

10. We have discussed all the questions that seem necessary to be mentioned in view of a new trial, but it may not be amiss to say that the statement of the prosecution to the jury of what testimony young Jacobson gave before the grand jury was out of place and prejudicial. No objection was made to it at the time. The harm was done when the statement was made. It will not be repeated on another trial and we pass it without further mention.

We easily gather from the record that there was a feeling in the neighborhood unfavorable to the defendant at the time of Middleton's death. There is talk of a mob and of lynching. We take it that this feeling had not disappeared at the time of the trial. When the defendant was called as a witness the court cautioned the audience, referring to it as a large crowd, to be orderly and law abiding. Shortly afterwards counsel, when objecting to the evidence relative to the horses which it was suggested the defendant had stolen 33 years before, submitted to the court that as an officer of it he should not be the object of derision when he made an objection. The court again asked the crowd to maintain order and not make any more demonstration. Again, at the opening of court one day, the defendant still on the stand, the court asked the crowd to maintain perfect order and to refrain from laughter or applause, and again, when the arguments to the jury began, the court asked the audience not to do anything that could disturb the jury and divert their attention, such as laughing or applauding or talking. We do not mention these things in

criticism of the court. Our purpose is not at all that. It is to be assumed that there was occasion for cautioning the audience; otherwise repeated cautions would not have been given. The court is to be commended in vigorously checking disorder and demonstration. No criticism is made of the fairness of the court. Throughout the trial it was impartial. Its charge was not tinctured with favoritism nor with an unfair attitude towards the defendant. It is not to be wondered that there was feeling against the defendant. Middleton was long a resident of the city. He was a worthy citizen. He was popular. The defendant was a newcomer. He seems to have been troublesome, something of a braggart, arrogant and domineering. His brief residence was long enough to make him disliked and unpopular. But whether he was good or bad, popular or unpopular, he was entitled to have the charge of guilt, and if he was found guilty the degree of his guilt, determined by minds reflecting calmly upon competent evidence unaffected by prejudicial testimony erroneously received or by suggestions and insinuations of the existence of harmful facts not proved. The conduct of the prosecution was not such as to permit the jury to give the impartial consideration which the law insures. The difficulty immediately attending the killing was the happening of a few moments. At the best impartial eye-witnesses might differ as to what occurred. Those who testified are interested or affected by bias. The jury should not be embarrassed by prejudicial evidence erroneously received, nor by a show of evidence not received, nor should it be subjected to the influence of local feeling. The defendant cannot complain of a vigorous prosecution. The state may prosecute vigorously, but the prosecution must observe the law which protects the accused.

Order reversed.