**STATE of Minnesota, Respondent,**

v.

**Richard CARPENTER, Appellant.**

**No. 47688.**

Supreme Court of Minnesota.

Aug. 24, 1979.

C. Paul Jones, Public Defender, and Linda Matthews Britton, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, App. Div., Asst. County Atty., and David W. Larson, Asst. County Atty., Minneapolis, for respondent.

Heard before SHERAN, C. J., OTIS and MAXWELL, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

This is an appeal by Richard Carpenter from his conviction of criminal sexual misconduct in the first degree on December 28, 1976, after a trial to the court. Carpenter raises issues concerning his insanity defense and sentencing. We affirm.

The victim in this case was a 25-year-old teacher at the Little Angel Day Care Center, which was located in and affiliated with the Holy Ghost Temple Church in Minneapolis. She arrived at work at 9:00 a. m. on Friday, April 9, 1976, the day of the rape. No children were expected, but she had some charts to work on. About 11:00 or 11:30 a. m., Richard Carpenter arrived. The victim had met him briefly about a month before when he had come by the day care center to visit his aunt, the director of the center. The victim heard him enter and

came out of the back room where she was working. Carpenter said he was waiting for his aunt to pick him up, and the victim went back to work. After about 15 minutes, she told Carpenter she was leaving, and he said he would wait for his aunt outside so he wouldn't be locked in. The day care center has two sets of doors with an alcove in between. As they passed through the inner set of doors and the victim turned to lock them, Carpenter from behind her put his arm around her throat. He said, "Don't move, I will kill you. Don't scream, Chris. I will kill you. Do what I say or I will kill you, and I want you to go back into the room with me." They walked back into the day care center, Carpenter's arm still around her neck. He asked her if she had a car or any money, and she said "No." Carpenter then asked for food, and began to lead her down the stairs to the basement kitchen, still holding her by the throat.

Halfway down the stairs, Carpenter stopped and said he was sorry he was doing this but couldn't help it. The victim started crying and asked him to take his arm away from her throat. He took her by the shoulders and led her down the stairs.

Once in the kitchen, the victim got him a bowl of cereal. They sat in the dining room, but Carpenter said he couldn't eat because his stomach was in knots. He was afraid the police or someone from St. Peter's (State Security Hospital, where he had previously been confined) would come to pick him up, and he didn't want to go back there. He said he had a brother in Rock Island, Illinois, and wanted to run, but didn't know if he would be able to. The victim tried to calm him by saying his aunt and his uncle, the pastor of the church, could help him.

After about 10 or 15 minutes of this conversation, the victim asked if they could please go upstairs; it was a sunny day and she would talk to him there. As she was locking the kitchen door, Carpenter became threatening again and grabbed her by the

throat. He took her down the hallway, saying, "Don't scream, I will kill you. Just follow me." He took her into the women's bathroom, put her up against the wall, and started kissing her. He said he needed her, he wanted to love her, and he wanted her to do what he wanted.

The victim asked if they could please go upstairs and she would talk to him while they waited for his aunt. Carpenter then led her by the shoulders back up the stairs. At that point he became afraid again, grabbed her by the throat, and began taking her up the stairway leading to the church balcony. He said, "I will kill you if you scream. Don't scream. Do what I say or I will kill you."

Carpenter took her into a room off the balcony, and told her to take off her clothes. She took her pants down, and Carpenter raped her. She testified she was very afraid for her life, and there is no mention of resistance. After about five minutes, Carpenter raped her again.

There was a good deal of conversation at this point. Carpenter talked about his father not going to church and himself not going to church, and about not being a saved person. He said she didn't know what kind of person he really was. He kept telling her not to be afraid, that he wouldn't hurt her, that he needed her, that he wanted to love her.

After the second rape a voice yelled, "Rich." Carpenter told the victim that was his uncle; she should get her clothes on right way, he had to run. He put his clothes on, combed his hair, and finally left the room.

After waiting a few minutes, the victim ran down the stairs and across the church, trying to find an unlocked door to the outside. She ran back to the day care center and was running across the room to get out when Carpenter came the other way and grabbed her. She got away, and Carpenter ran the other way. The outside door was locked, and the victim began pounding on it

and yelling, "Mr. Carpenter!" Reverend Carpenter eventually came to the door and asked her what happened.

The victim testified that she told Reverend Carpenter about the rape immediately. Reverend Carpenter, however, testified she would not tell him what had happened.

Mrs. Carpenter testified that Richard Carpenter called her from the church at about 1:00 p. m. on the 9th, was very upset, and told her he had "raped Chris." Carpenter seemed to feel bad about it, and excited, and didn't know what his uncle would do about it.

A great deal of evidence was introduced concerning Carpenter's background and mental condition. He was raised in Rock Island, Illinois, along with several brothers, all of whom were severely beaten by their father. Because of the beatings and domestic problems between his mother and father, Carpenter came to Minneapolis to live with his aunt and uncle at about age 16.

In 1969, at about age 18, Carpenter was sent to St. Cloud Reformatory on an aggravated arson charge. At St. Cloud he first began to have hallucinations of wild animals surrounding him and growling in his bed at night. Sometimes the animals comforted him. Sometimes he had trouble distinguishing himself from the animals and believed he had turned into a lion. He became lonely and depressed and felt that others were trying to hurt him.

After a year and a half at St. Cloud, Carpenter was committed to the State Security Hospital at St. Peter as mentally ill and dangerous. In 1972, he was transferred to Anoka State Hospital, but after a month he assaulted a male psychiatric technician and was returned to St. Peter.

The hallucinations did not return until the fall of 1975. He became very depressed and attempted suicide by drinking toilet cleaning fluid. He assaulted a staff nurse and was placed in isolation. In isolation, he began to have the idea the bed was breathing, and he heard the sound of flies buzzing.

The man in the next cell, who had become the best friend Carpenter had had in years, hanged himself. Carpenter expressed suicidal intent to a guard, and he was removed from isolation after about a month.

Carpenter appeared much improved during the four months he spent at St. Peter after being in isolation. He got involved in different activities, including group therapy. On February 20, 1976, Carpenter was given a provisional discharge from St. Peter.

Carpenter began living at a halfway house in Minneapolis called the Andrews Care Home. His supervising psychiatrist was Dr. Loren Pilling of the Metropolitan Medical Center, who saw him only once before the rape, on February 26, and diagnosed him as a schizoid personality. Dr. Pilling distinguished this from the mental illness, schizophrenia. Carpenter was very lonely at Andrews. He became attached to a young nurse's aid. After being told residents could not date staff, on March 18 Carpenter had an incident with the aid involving striking her legs and buttocks and shoving her. Carpenter at other times was angry and had difficulty getting along with the staff at Andrews.

On the evening of April 8, 1976, the day before the rape, Carpenter had a severe psychotic episode. He believed he had turned into a lion and growled, foamed at the mouth, and ran back and forth to hug one of the male staff. Eventually, he ran out of the building, still mimicking an animal.

Carpenter ran to his uncle's Pentecostal church a few blocks away. From there he called his aunt, said he was having problems, and asked to be picked up. His cousin and her husband came to get him. He was still growling like an animal and crying. The relatives, both Pentecostals, believed he was possessed by a demon. They prayed over him and annointed him with oil; he calmed down, and they believed they had exorcised the demon. They took him back to Andrews, but the staff was still afraid of him and refused to let him stay. Dr. Pilling was called, who suggested he be taken to Metropolitan Medical Center. However, the only available room there was a security room, and Carpenter refused to stay there because it was like a cage. He spent the night quietly at his aunt and uncle's home.

The next morning, April 9, Carpenter went back to the Metropolitan Medical Center for an appointment with Dr. Pilling, who tried to evaluate his condition and determine what treatment would be best for him. Dr. Pilling tried to convince Carpenter he needed hospitalization and medication,[1] but Carpenter was very angry and refused. Dr. Pilling diagnosed his condition at this time as schizophrenia, meaning basically a loss of contact with reality. It seemed to Dr. Pilling that Carpenter didn't know what he was doing. Dr. Pilling did testify, however, that at that time Carpenter did understand right and wrong and was able to make conscious decisions regarding right and wrong.

Dr. Pilling concluded Carpenter was of no danger to himself or others, and decided not to force him to remain at the hospital. Carpenter left after the interview. It was at this point that he went to his uncle's church to call for a ride from his aunt and uncle and the rape took place.

Dr. Carl Malmquist, the consulting psychiatrist of the Hennepin County District Court, testified for the defense. Carpenter was interviewed by Dr. Malmquist and denied that he had coerced the victim into sexual relations. Dr. Malmquist diagnosed Carpenter as being in a psychotic-depressive state at the time of the rape. It was Dr. Malmquist's opinion that this mental illness deprived Carpenter of control over his will power to choose between right and wrong.

---

1. The record regarding Carpenter's medication is somewhat unclear. Apparently, he was not on a regular medication at Andrews, but was given a tranquilizer called sparine upon request. He may have received such a tranquilizer during the psychotic episode on the evening of April 8. There is no evidence that he received any medication on April 9.

Dr. Malmquist emphasized a number of things about Carpenter's mental state at the time of the rape, based on his interview with Carpenter. Carpenter had apparently been told at the Metropolitan Medical Center that he would be returned to St. Peter. Carpenter was very much afraid of this and quite lonely and depressed as he went to his uncle's church. He felt he would be isolated from people and "he needed desperately someone to hang onto somewhere." He told the day care teacher about his fears, found her supportive, and sexual relations resulted. Physical affection had been very comforting for Carpenter previously when he was involved with a nurse at St. Peter.

Dr. Malmquist originally seemed to be proposing the defense that because of Carpenter's loss of contact with reality and his great loneliness and need for comfort, he may have misinterpreted the signals given off by the victim, who was trying to calm and reassure him to protect herself from harm. In the course of cross-examination and extensive questioning by the court, Dr. Malquist began to emphasize Carpenter's lack of ability to control his behavior. Although he knew what he was doing was wrong, his desperate need deprived him of self-control. The trial court rejected this insanity defense, entered a judgment of guilty, and this appeal resulted.

■ 1. The first claim raised by Carpenter is that the trial court erred in rejecting his insanity defense. The standard for acquittal by reason of insanity is found at Minn.St. 611.026:

"No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

The leading case interpreting this statute is *State v. Rawland*, 294 Minn. 17, 199 N.W.2d 774 (1972). We have reviewed the evidence of the assault of the Carpenter's mental condition, summarized above, in light of *Rawland* and our subsequent decisions on this subject, and conclude the finding of guilty is sustained by the evidence.

■ 2. Under Minn.St. 611.026, the defendant pleading not guilty by reason of insanity bears a burden of proving the defense by a preponderance of the evidence. Carpenter claims this burden denied him due process of law, citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). This issue has been previously decided by this court, *State v. Mytych*, 292 Minn. 248, 194 N.W.2d 276 (1972), and reaffirmed in 1976 in *State v. Bott*, 310 Minn. 331, 246 N.W.2d 48, to which we adhere. The United States Supreme Court has even more recently approved the reasoning of these Minnesota cases. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). We are satisfied that every element of the offense in this case was proved by the state beyond a reasonable doubt and the defendant was not required to disprove any element.

■ 3. The final issues raised by Carpenter concern his sentencing. Carpenter was found guilty on December 28, 1976. On January 10, 1977, Carpenter stipulated that he was mentally ill and dangerous and therefore subject to civil commitment under the Hospitalization and Commitment Act, Minn.St. c. 253A. By order of January 11, 1977, the trial court stayed imposition of sentence for 20 years, conditioned upon Carpenter's compliance with chapter 253A, until he was eligible for discharge from the control of the Commissioner of Public Welfare, at which time he would be returned to the court for further sentencing. The same order committed Carpenter to the Commissioner of Public Welfare for hospitalization at the State Security Hospital at St. Peter.

On March 9, 1977, the medical director at St. Peter filed a 60-day report as required

by Minn.St. 253A.07, subd. 23. The report stated that Carpenter was not psychotic, but suffered from a personality disorder making him mentally ill and dangerous, requiring civil commitment. The report further stated that his condition was not treatable and recommended that he be returned to the court for sentencing. Should he experience a psychotic episode in prison, he could then be returned to St. Peter for treatment under his mentally ill and dangerous commitment.

On May 11, 1977, a review of commitment hearing was held before the trial court pursuant to Minn.St. 253A.07, subd. 26. On October 14, 1977, the court denied Carpenter's motion for indeterminate hospitalization under chapter 253A. The court stated that chapter 253A did not require hospitalization of a committed individual; that in addition to the alternatives of indeterminate hospitalization or discharge there was the legal possibility of continued civil commitment after the imposition of sentence and subsequent imprisonment. On January 31, 1978, the trial court imposed sentence, committing Carpenter to the Commissioner of Corrections for a period not to exceed 20 years.

Carpenter challenges this procedure and resulting double commitment as denying him due process and equal protection of the law. There is no merit to these claims. Carpenter's commitment to the Commissioner of Public Welfare resulted from his own voluntary stipulation that he was mentally ill and dangerous. Cases raising an equal protection bar to such a commitment where the prisoner is unwilling are inapposite. Nor can Carpenter complain that the decision to transfer him from St. Peter to Stillwater was made without due process. Though there was no formal revocation of probation hearing, none was necessary because there was no actual probation. Carpenter's original commitment to St. Peter was more in the nature of a continuance. In any event, the review of commitment hearing served the purpose of providing a forum for Carpenter to challenge the findings of the 60-day report and recommendation that he be transferred to St. Peter.

It is apparent from the record that the trial court made every effort to fashion an appropriate disposition for this difficult case and did so with every regard for the defendant's constitutional rights.

■ 4. The final issue raised is whether time spent by Carpenter at St. Peter and in the Hennepin County Jail should be subtracted from his 20-year sentence or the target release date computed by the Department of Corrections. Though this is an important question, we decline to consider it as part of his direct appeal. The proper adversary party is the Department of Corrections, which is not a party to this case. Though efforts have been made to properly bring this issue before the court, we do not believe it as been given adequate presentation in light of the particular facts of this case. Accordingly, we defer judgment until such time as a post-conviction proceeding involving appropriate parties brings the issue before us.

Affirmed.