*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1371**

State of Minnesota,
Respondent,

vs.

Jennifer Rae Flint,
Appellant

**Filed July 20, 2015
Reversed
Rodenberg, Judge**

Polk County District Court
File No. 60-CR-13-1843

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Greg Widseth, Polk County Attorney, Scott A. Buhler, Assistant County Attorney, Crookston, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Erik I. Withall, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Larkin, Presiding Judge; Rodenberg, Judge; and

Reyes, Judge.

UNPUBLISHED OPINION

**RODENBERG**, Judge

Appellant challenges her conviction for child neglect, arguing that there was insufficient evidence to demonstrate that harm to her two young children was more likely to occur than not when she left the children home alone. We reverse.

**FACTS**

On August 30, 2013, appellant Jennifer Flint's neighbor called 911 to report that he suspected that appellant's two minor children were home alone. Appellant's older child, T.F., was seven years old and her younger child, E.M., was four years old. Responding Officer Alexander Scott Schilke of the East Grand Forks Police Department arrived at the apartment at 11:12 p.m. to do a welfare check. He knocked on appellant's apartment door for two or three minutes. No one opened the door, but Officer Schilke could hear the sound of a television through the door. One of appellant's neighbors came out of her apartment while Officer Schilke was knocking. She told Officer Schilke that appellant lived in the apartment, that appellant had two young sons, and that she thought appellant had gone to a nearby bowling alley. Officer Schilke then radioed his sergeant, Michael Anderson, asking him to go to the bowling alley to determine if appellant was there.

Officer Schilke continued to knock on appellant's apartment door for five to eight additional minutes. Because appellant's apartment was on the ground floor, Officer Schilke then went outside and looked through the exterior sliding-glass door into appellant's apartment. He observed that the television was turned off and that the

bedroom lights that he had earlier observed to be off were now lit. He saw "a young boy peek through the blinds of the bedroom window and then turn the light off in the bedroom." Officer Schilke returned to the interior hallway door to the apartment and stated "[T.F.], you're not in trouble come talk to me." T.F. then opened the apartment door.

T.F and E.M. had been alone in the apartment. Officer Schilke asked T.F. some questions, including where T.F.'s mother went and whether she leaves him at home often. T.F. responded that his mother had left to get pizza and that she sometimes leaves to go tanning.

During this same time, Sergeant Anderson went to the bowling alley as requested. There he found appellant seated at the bar with "an alcoholic beverage in front of her and a stack of pull tabs." When Sergeant Anderson approached appellant and asked her if she had left her children at home, she nodded, became upset, and began crying. Sergeant Anderson testified that appellant "appeared intoxicated." He "ordered her to return home immediately." He left in his squad car and appellant rode her bicycle home. Sergeant Anderson testified that he did not ask appellant why she was at the bowling alley or what she was doing there. When Sergeant Anderson reached appellant's apartment, appellant had already arrived and was speaking to Officer Schilke.

Sergeant Anderson then asked T.F. whether he knew what to do if there was a fire (T.F. stated that he did not), if there was anyone in the building to whom he could go if there was a problem (T.F. stated that he did not know anyone in the building), and if he

3

knew how to call 911 (T.F. stated that he did, but said that the pre-paid phone in the apartment had no minutes on it).

Appellant was neither arrested nor issued any charges on August 30. A child protection worker visited appellant's home six days later. She identified no safety concerns and observed the apartment to be clean and without apparent health or safety hazards. On September 13, 2013, appellant was charged with two gross-misdemeanor counts of child endangerment in violation of Minn. Stat. § 609.378, subd. 1(a)(1) (2012), for the incident on August 30, one count for each child. Appellant moved to dismiss for lack of probable cause, and the district court denied this motion. Appellant waived her right to a jury trial and the case was tried to the district court.

T.F. testified at trial that he was in charge of his younger brother on August 30 when his mother left to get pizza. T.F. testified that he was scared when Officer Schilke was knocking on the door, but that he did not consider calling 911. He testified that appellant had "just gone out for a minute."[1] He testified that he told Officer Anderson that he did not know what to do if there was a fire, that he did not know anyone in the building, and that he knew how to call 911, but that the pre-paid phone did not have any minutes left. On cross-examination, T.F. testified that he did have friends in the building at the time of the incident, but he did not say that to the police because he was scared and nervous. He also testified that if there was a fire, or if his younger brother would have been injured, he would have called 911.

---

[1] As with much of T.F.'s testimony, he responded affirmatively to a leading question.

The state elicited trial testimony concerning potential hazards in the area surrounding the apartment. Specifically, Officer Schilke testified that there was an outdoor pool on the apartment's property, a highway nine blocks away ("the busiest road in East Grand Forks"), a "busier street" five blocks away, a hotel that places "numerous" calls to police for "drug charges, domestic charges" six or seven blocks away, and a trailer court that is "another high drug area of town" located "across the street."

The state asked Sergeant Anderson at trial whether, in the absence of adult supervision of these children, life-threatening injury was "likely to happen." Sergeant Anderson responded "I don't know if it's likely. I think that's the wrong word to use. It certainly can happen and I wouldn't want to see that happen."

The state also called as a witness at trial the neighbor who had called 911 on the night of the incident. He observed appellant entering the bowling alley and noticed that the truck owned by appellant's younger son's father was not parked in the apartment complex lot, as it usually is when appellant is not at the apartment. The neighbor testified that he was concerned because he saw "what happened with [his] ex-wife and other people [he] know[s] with young kids," explaining that his ex-wife had left their children home alone and that he had called child protection concerning that incident. He also testified that he saw "random kids sit [outside in a trailer court] with no supervision and [did not] think it's right that young kids are out there without supervision."

The child protection social worker who met with appellant following the incident testified as a defense witness at trial. She testified that she visited appellant's home on September 5, 2013, and that she did not see any safety concerns. She testified that the

5

house was well maintained, that the floors were clean and free from clutter, and that she did not see "any health hazards, anything like that." She also testified that she consults Minnesota guidelines for screening reports to assess whether children are old enough to be left home alone. She testified that when a child is seven years old or younger, she would "make a report on that," but also testified that T.F., who was eight years old at trial, "would . . . [be] capable [of staying home alone now] with the maturity level [she saw], however if [T.F.] had done some safety planning with mom [she would] be more comfortable with that." She also testified that Minnesota guidelines recommend that a child should be 11 years old to watch another child.

The district court found appellant guilty on both counts. In its findings of fact and conclusions of law, the district court stated that appellant "willfully deprived [her children] of necessary supervision appropriate to each respective child's age" and that "such neglect was more likely than not to cause substantial harm to both" children. The district court concluded that "whatever mishaps were to occur with her young fragile children would rapidly progress to substantially harmful mishaps." The district court discussed the "hazards in the nearby neighborhood" and stated that, absent supervision, "there was no guarantee these two boys would remain in the apartment." It added:

> The Court further finds that failure to [find appellant guilty] would send a message from this district court that it is not necessary for any parent, guardian, relative or other caregiver to supervise children of this age under these circumstances and further, that children of this age may be left unattended; the Court is unwilling to convey that message to [appellant] and/or the public.

6

The district court sentenced appellant to two 60-day jail terms to be served consecutively, stayed for one year, and placed appellant on supervised probation. This appeal followed.

## D E C I S I O N

When reviewing sufficiency of the evidence, we thoroughly review the record to determine whether the evidence establishes guilt beyond a reasonable doubt. *See State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (stating that the appellate court reviews the facts and the legitimate inferences drawn therefrom to decide whether the evidence supports the guilty verdict). We view facts in the light most favorable to the conviction and assume the district court "believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). A conviction may be reversed if we conclude that the fact-finder acted without due regard for the presumption of innocence and the necessity of overcoming that presumption by proof beyond a reasonable doubt.[2] *State v. Combs*, 292 Minn. 317, 320, 195 N.W.2d 176, 178 (1972); *see State v. Mytych*, 292 Minn. 248, 251-52, 194 N.W.2d 276, 279 (1972) ("[We]

---

[2] We observe that the evidence presented at trial was direct evidence. Despite the parties' briefing and arguments concerning the heightened circumstantial-evidence standard of review, we do not apply that standard. *See State v. Hokanson*, 821 N.W.2d 340, 353 n.1 (Minn. 2012) ("Direct evidence is that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact." (Quotation omitted)); *State v. Silvernail*, 831 N.W.2d 594, 604 (Minn. 2013) (Stras, J., concurring in part) (defining circumstantial evidence as "evidence based on inference and not on personal knowledge or observation [and that b]y definition, the fact-finder must make an inference from . . . in order to find the ultimate fact . . . asserted by the proponent of the evidence" (quotation and citation omitted)). All five witnesses at trial testified to what they saw, heard, or experienced.

appl[y] the same standard to cases heard before the court . . . as to those heard by a jury.").

To convict appellant of child endangerment, the state must prove both that appellant willfully deprived her children of supervision and that the deprivation was "likely to substantially harm the child[ren]'s physical, mental, or emotional health." Minn. Stat. § 609.378, subd. 1(a)(1). Appellant concedes that she deprived her children of supervision and challenges only the second element of the charged offense. She maintains that the evidence at trial failed to prove beyond reasonable doubt that T.F. and E.M. were likely to be substantially harmed due to the lack of supervision.

Interpreting statutory language presents a question of law that we review de novo. *State v. Perry*, 725 N.W.2d 761, 764 (Minn. App. 2007), *review denied* (Minn. Mar. 20, 2007). In *State v. Tice*, 686 N.W.2d 351, 352, 355 (Minn. App. 2004), *review denied* (Minn. Nov. 16, 2004), we adopted the district court's conclusion that the child-endangerment statute's requirement that the neglect or endangerment be "likely to substantially harm" a child requires proof that "harm would more likely than not result from the conduct."

In *Tice*, the state appealed the district court's grant of respondents' motion to dismiss for lack of probable cause. 686 N.W.2d at 352. Respondents, parents of three children (two of them six, and the other eight months), locked their three children in a parked vehicle in a retail-store parking lot in March when it was seven degrees outside. *Id.* The parents went into a retail store. *Id.* The parents left the vehicle's engine running and the heater on, and the children were "appropriately dressed for the weather and they

8

did not appear upset" when approached by police. *Id.* The parents left the vehicle for approximately 40 minutes, stating they left the children in the vehicle "because the youngest child was sleeping, and [the parents] anticipated being in the store for only a brief time . . . [and they] had admonished the children to stay in the car and not to let anyone into the car." *Id.*

We affirmed the district court's dismissal of the endangerment charges in *Tice*, concluding that "likely to substantially harm" under Minn. Stat. § 609.378, subd. 1(a)(1), must be construed in the context of the potential consequences that may result from a defendant's "acts or omissions." *Id.* at 354. In recognizing that we strictly construe statutes, we concluded that the statute criminalizes negligence. *Id.* at 354-55. Because ordinary negligence is presumed insufficient to constitute a crime, "likely" must require "more than a simple deviation from the standard of care." *Id.* at 355. We explained that "[t]he risk of harm must be greater than being merely within the realm of any conceivable possibility." *Id.* (quotation omitted); *see also State v. Grover*, 437 N.W.2d 60, 63 (Minn. 1989) (stating that "absent a clear legislative declaration . . . we will interpret any criminal negligence statute as requiring a showing that the actor's conduct involved a gross deviation from the standard of care that a reasonable person would observe in the actor's situation" (quotation omitted)). We concluded that "while respondents' conduct may have been ill-advised, a clear legislative intent appears to criminalize only conduct that is *more* than ordinary civil negligence." *Tice*, 686 N.W.2d at 355.

We review the district court's guilty verdicts in the light most favorable to the verdicts. *See Webb*, 440 N.W.2d at 430. The facts are not materially disputed on appeal.

9

The state did not prove that there were poisons, cleaners, candles, matches, or other potentially hazardous materials found in the home the night of the incident. The social worker also observed no such hazards when she visited appellant's home six days after the incident. Correspondingly, appellant does not dispute that there was a swimming pool on the apartment's property, that there were busy streets and highways nearby, and that there were other risks to the children being left alone at night. She also makes no claim on appeal that the district court clearly erred finding that "there was no guarantee that these two boys would remain in the apartment."

But *Tice* requires that a conviction for child endangerment must be supported by evidence demonstrating that substantial harm to the children would more likely than not result from the parental failure, not merely that substantial harm *could* occur. Stated differently, the state must prove at least a 51% chance that substantial harm would occur to sufficiently support guilty verdicts. *See Dickhoff by Dickhoff v. Green*, 836 N.W.2d 321, 333 (Minn. 2013) (explaining that, as a matter of law, an action against a doctor can stand only if "the alleged faulty diagnosis [was] more likely than not . . . the cause of the patient's injury" and that this could be proved only if the patient's odds of survival before the diagnosis was higher than 50 percent).

Sergeant Anderson, who observed the situation and spoke with T.F., testified that "likely" was the wrong word to use to describe the probability of harm to these children, instead replying that substantial harm "certainly can happen." But proof that harm to children "can happen" does not meet the legal standard required to establish criminal child neglect and endangerment.

10

We think it important to observe that law enforcement and child protection performed exemplary work here. Law enforcement officers investigated and appropriately handled the citizen report. They properly focused their attention on the safety of these children, referred the incident to child protection social workers, and determined that the children did not need to be removed from their home and that appellant need not be arrested. The responding social worker properly assessed the home and found it clean and safe. In concluding that the evidence here is insufficient to sustain the district court's verdicts of guilty, we express no disapproval of the actions taken by law enforcement or child protection involved in this case. These professionals did their jobs and did them well.

Because *Tice* requires that a conviction for child neglect or endangerment be supported by evidence demonstrating that substantial harm is more likely to occur than not, and the evidence proved at trial does not meet this threshold, we reverse the district court's determination and conclude that the evidence at trial failed to prove that appellant's lack of supervision of her children was likely to cause substantial harm to them.

**Reversed.**