## STATE v. ELEANOR THERESA MYTYCH.

194 N. W. 2d 276.

February 4, 1972—No. 41956.

*C. Paul Jones,* State Public Defender, and *G. Thomas MacIntosh II* and *Richard B. Allyn,* Assistant State Public Defenders, for appellant.

*Warren Spannaus,* Attorney General, *James M. Kelley,* Assistant Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Murphy, Otis, Kelly, and Odden, JJ.

DONALD C. ODDEN, JUSTICE.*

Defendant appeals from a judgment entered pursuant to a verdict, reached by the court without a jury, finding her guilty of third-degree murder and aggravated assault.

Defendant, Eleanor Theresa Mytych, met Sam Pulford in May 1964 in Bensenville, Illinois, a suburb of Chicago. At that time defendant had been a divorcee for 6 months and Pulford was estranged from his wife. Initial casual dating soon became frequent so that, by the fall of 1965, the two saw each other almost every day. They were occasionally intimate and there was discussion of marriage. Pulford was divorced from his wife in May 1966. In December 1966, while continuing to date defendant and apparently making plans for a January 1967 marriage to her, Pulford met an old acquaintance, Janet Williams, and began to date her. At that time neither woman knew of the other. After April 1967 Pulford saw Janet Williams exclusively and married her on July 22, 1967. As a result of a series of job transfers just prior to the marriage, Pulford and his new wife moved into an apartment in St. Paul. When defendant called him in St. Paul he told her that he was now married and he wrote her to the same effect. She was shocked and insisted upon seeing him. She flew to St. Paul on September 20, 1967, where Pulford picked

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

her up at the airport, took her to several bars, and after telling her that his marriage to Janet was merely platonic, took her to a motel where they engaged in sexual relations. Communication for the next 4 months consisted largely of efforts by defendant to learn when Pulford would see her again. In February 1968 he visited Chicago where he again saw defendant. Telephone conversations continued thereafter between them until March 14, 1968, the date of the homicide and the assault.

In February 1968 defendant, while in Chicago, purchased a revolver. Her expressed reason for doing so was for self-protection in her home, which is located in a wooded area with few close neighbors. On the Tuesday prior to March 14, 1968, defendant made a plane reservation to St. Paul under an assumed name. On the morning of March 14, 1968, after calling her employer and reporting that she was ill and would not come to work, she went to the airport, purchased a ticket under the assumed name, and flew to St. Paul. She took her revolver with her. Upon arrival at the Twin Cities International Airport, she went to a rest room, loaded the revolver, and took a cab to the St. Paul Bus Depot. From there, she took another cab to the Pulford apartment and rang the bell. Pulford, in bed at the time, opened the door at his wife's insistence but only after his wife had gone to the bathroom. After letting defendant into his apartment, he walked down a short hallway to get a cigarette and had turned back toward defendant when she shot him in the side. Pulford heard two more shots while lying on the floor. When he arose he found his wife's body in the bathtub, lifeless as a result of two bullet wounds. Defendant denied any memory of taking the gun from her purse and firing it.

Defendant left the apartment, called a cab from a drugstore, and rode to the St. Paul Bus Depot. From there, she took another cab to the airport. She was arrested shortly after her arrival there. A search of her purse at that time revealed a .38-caliber revolver, loaded, except for three spent cartridges. It was stipulated that a crime laboratory analyst had concluded after appro-

priate scientific investigation that the bullets fired in the Pulford apartment came from this gun. Defendant was brought into the St. Paul Police Department and given a Miranda warning. She then answered questions concerning her name, age, and marital status. She expressed concern for her daughter in Chicago, asked to contact an Illinois attorney with whom she was acquainted, and refused to permit a nitrate test on her hands. When she refused to answer questions about the events surrounding the shooting and because her memory appeared to be "spotty," defendant was transferred to the mental ward at the St. Paul-Ramsey Hospital for examination.

On March 19, 1968, defendant was indicted for murder in the first degree and aggravated assault. Upon her plea of not guilty to both charges, she voluntarily waived her right to a jury trial in open court and the case proceeded to trial before the Hon. John W. Graff, Chief Judge of the Ramsey County District Court. The court found her guilty of murder in the third degree and aggravated assault and ordered her to serve concurrent indeterminate sentences.

On appeal defendant raises three issues:

(1) Was the trial court in error when it found that defendant had not proved by the required degree of proof that at the time the acts were committed she was laboring under such a defect of reason from insanity as not to know the nature of her acts or that such acts were wrong?

(2) Was defendant denied due process of law when she was required to carry the burden of proving her defense of insanity by a fair preponderance of the evidence?

(3) From the evidence in this case, was the trial court in error when it found defendant guilty of third-degree murder?

■ The trial court found that defendant had not established her defense of insanity by the required degree of proof. Defendant argues that this finding is in error, and that she did, in fact, meet her burden. In reviewing the sufficiency of the evidence

in criminal cases, this court applies the same standard to cases heard before the court without a jury as to those heard by a jury. State v. Gardin, 251 Minn. 157, 161, 86 N. W. 2d 711, 715 (1957); State v. Crosby, 277 Minn. 22, 24, 151 N. W. 2d 297, 299 (1967).

Defendant seems to believe that the trial judge was dutybound to accept the opinions of the expert witnesses who testified in her behalf and to ignore expert testimony produced by the prosecution. There were three expert opinions rendered; two witnesses called by the defendant stated that in their opinion defendant at the time of the crimes was insane, and a rebuttal witness called by the state testified that in his opinion defendant was sane. There was vigorous cross-examination of all three experts.

This court's responsibility is not that of trying the facts again but of making a rigorous review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the trial court to reach its conclusion. State v. Thompson, 273 Minn. 1, 36, 139 N. W. 2d 490, 515, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. 2d 56 (1966); State v. Kline, 266 Minn. 372, 374, 124 N. W. 2d 416, 418 (1963), certiorari denied, 376 U. S. 962, 84 S. Ct. 1124, 11 L. ed. 2d 980 (1964).

We have made a rigorous review of the record and find that the trial court's finding on this issue is well-founded. Defendant's actions prior to and after the commission of the crime established that she knew full well what she was doing. It is sufficient to state that we are convinced that the evidence sustains the court's finding on this issue.

■ Defendant further contends that she was denied due process of law when she was required to prove her defense of insanity as required under Minn. St. 611.025 and Minn. St. 1969, § 611.026, because to do so denied her the right to the presumption of innocence and relieved the state from proving an essential element of the crime. She further claims that, as a result of the burden of proving insanity, she was forced to forego her right

to remain silent and, thus, was placed in jeopardy of establishing that she had a depraved mind which resulted in her conviction of murder in the third degree. The pertinent statutes read as follows:

Minn. St. 611.025. "Except as otherwise provided by law, in every criminal proceeding, a person is presumed to be responsible for his acts and the burden of rebutting such presumption is upon him."

Minn. St. 1969, § 611.026. "No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

The statutes, in effect, state the so-called M'Naghten rule. It has been the law of this state since 1885 and has been commonly referred to as the "right-and-wrong" test of criminal insanity. For many years the M'Naghten rule has been subjected to severe attack on the ground it is archaic and inadequate. This court most adequately stated its position on the subject in State v. Dhaemers, 276 Minn. 332, 339, 150 N. W. 2d 61, 66 (1967), when Mr. Chief Justice Knutson wrote:

"While we agree that the M'Naghten rule should have been discarded with the horse and buggy, it is part of our statutory law and as such, as long as we adhere to the rule that the legislature can prescribe rules of evidence, we must adhere to the statute. State v. Finn, 257 Minn. 138, 100 N. W. (2d) 508. It would be better if the statute were repealed so that the courts could develop rules for determining mental competency more in harmony with advances made in this scientific field since the announcement of the M'Naghten rule in 1843."

Since this state has considered the M'Naghten rule as evidentiary rather than an "essential-element-of-the-crime" theory, resort must be made to the legislature and not this court if the rule is to be abolished. We concede, as defendant contends, that we are in the minority on this policy, but we do not concede that those jurisdictions which place the burden of proving sanity on the prosecution have done so on the theory that to require otherwise would be a violation of due process. In fact, of all the jurisdictions presently placing the burden of proving sanity upon the state, only Colorado has adopted that rule on grounds of due process.[1] All other jurisdictions have merely treated it as a rule of evidence.[2]

The Supreme Court of the United States considered this pre-

---

[1] People ex rel. Juhan v. District Court, 165 Colo. 253, 439 P. 2d 741 (1968).

[2] See, Davis v. United States, 160 U. S. 469, 16 S. Ct. 353, 40 L. ed. 499 (1895); Beltran v. United States, 302 F. 2d 48 (1 Cir. 1962); United States v. Currens, 290 F. 2d 751 (3 Cir. 1961); Hall v. United States, 295 F. 2d 26 (4 Cir. 1961); Howard v. United States, 232 F. 2d 274 (5 Cir. 1956); Dusky v. United States, 295 F. 2d 743 (8 Cir. 1961); Rivers v. United States, 270 F. 2d 435 (9 Cir. 1959); McKenzie v. United States, 266 F. 2d 524 (10 Cir. 1959); Jones v. United States, 109 App. D. C. 111, 284 F. 2d 245 (1960); State v. Martin, 102 Ariz. 142, 426 P. 2d 639 (1967); State v. Joseph, 96 Conn. 637, 115 A. 85 (1921); Farrell v. State, 101 So. 2d 130 (Fla. 1958); State v. Moeller, 50 Hawaii 110, 433 P. 2d 136 (1967); People v. Conrad, 81 Ill. App. 2d 34, 225 N. E. 2d 713 (1967); Whitaker v. State, 240 Ind. 676, 168 N. E. 2d 212 (1960); Bradford v. State, 234 Md. 505, 200 A. 2d 150 (1964); Chin Kee v. Commonwealth, 354 Mass. 156, 235 N. E. 2d 787 (1968); People v. Cole, 8 Mich. App. 250, 154 N. W. 2d 579 (1967), reversed on other grounds, 382 Mich. 695, 172 N. W. 2d 354 (1969); Cunningham v. State, 56 Miss. 269 (1879); Thompson v. State, 159 Neb. 685, 68 N. W. 2d 267 (1955); State v. Bartlett, 43 N. H. 224 (1861); State v. Roy, 40 N. Mex. 397, 60 P. 2d 646 (1936); People v. Hari, 30 App. Div. 2d 1046, 294 N. Y. S. 2d 759 (1968); Whisenhunt v. State, 279 P. 2d 366 (Okla. Cr. 1954); State v. Waugh, 80 S. D. 503, 127 N. W. 2d 429 (1964); Jordan v. State, 124 Tenn. 81, 135 S. W. 327 (1911); State v. Holt, 22 Utah 2d 109, 449 P. 2d 119 (1969); State v. Esser, 16 Wis. 2d 567, 115 N. W. 2d 505 (1962); State v. Pressler, 16 Wyo. 214, 92 P. 806 (1907).

cise issue in Leland v. Oregon, 343 U. S. 790, 72 S. Ct. 1002, 96 L. ed. 1302 (1952). In that case, the defendant entered a plea of not guilty by reason of insanity, was convicted of first-degree murder, and appealed to the Supreme Court of Oregon where his conviction was affirmed. On appeal to the Supreme Court of the United States, that court held that the Oregon statute which required an accused, on a plea of insanity, to establish that defense beyond a reasonable doubt, did not violate the due process clause of the Federal Constitution, even though the burden of proof required was greater in Oregon than that required to establish the defense in courts of other states and in Federal courts.

Defendant contends that "Leland's days are numbered." It is our view, however, that defendant was not, in fact, required to disprove one of the essential elements of the crime, and the decision in Leland, permitting states to retain latitude in establishing procedural requirements consistent with due process, is not affected. Since Leland has never been overruled and has remained the law of this land since 1952, it would seem that Leland's days are not numbered; Leland is alive and well.

Since we hold there is no constitutional proscription against requiring a defendant to sustain the burden of proof on insanity, defendant's argument in relation to the privilege against self-incrimination evaporates. She was properly faced with a decision with respect to testifying in furtherance of her burden of proof on insanity, constitutionally permissible as imposed, or exercising her right to remain silent. She could just as well argue that she had the right to testify in her own behalf without subjecting herself to cross-examination. Any decision to testify in one's own behalf involves recognized and proper risks.

We therefore hold that Minn. St. 611.025 and Minn. St. 1969, § 611.026, imposing upon defendants the burden of persuasion on the defense of insanity are not constitutionally prohibited.

■ Defendant's final contention is that the trial court com-

mitted error when it found her guilty of third-degree murder[3] when, she asserts, the facts show that the fatal shots were directed with particularity and may have well been the result of culpable negligence which would constitute second-degree manslaughter.[4] She cites in support of her contention State v. Lowe, 66 Minn. 296, 68 N. W. 1094 (1896); State v. Kopetka, 265 Minn. 371, 121 N. W. 2d 783 (1963); and State v. Nelson, 148 Minn. 285, 181 N. W. 850 (1921).

We find, after a careful review of defendant's contention on this issue, that those cases relied on by defendant are clearly distinguishable from the case at hand. The learned trial judge in his lengthy findings determined that the state had failed to sustain its burden to prove beyond a reasonable doubt the intent of the defendant to effect death. Since intent to effect death is a statutory essential for conviction of murder in the first degree or second degree, the court ruled out a conviction of such crimes. The court did, however, establish that the four statutory essentials of murder in the third degree had been met. We here quote from the court's findings:

"Minnesota Statutes 609.195 as far as it is applicable here, defines murder in the third degree as follows:

" 'Whoever, without intent to effect the death of any person,

---

[3] Minn. St. 609.195(1) defines murder in the third degree: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years.

"(1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life."

[4] Minn. St. 609.205(1) defines manslaughter in the second degree: "Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree and may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $7,000, or both:

"(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another."

causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, regardless of human life.'

"The statutory essentials of murder in the third degree are:

"1. The act must cause the death of another.

"2. The death must be caused by perpetrating an act eminently dangerous to others.

"3. The act must evince a depraved mind regardless of human life.

"4. The act must have been committed in Ramsey County, Minnesota on March 14, 1968.

"While this statute states the act must be without intent to effect death, affirmative proof of the lack of such intent is not necessary. See State versus Walker, a recent Minnesota case, 157 N. W. 2d 508. There is no question in this case that the act of the defendant caused the death of Janet Pulford. Likewise, there is no question that death was caused by perpetrating an act dangerous to others; the firing of the revolver by Eleanor Mytych was an act dangerous to others. The third statutory essential is that the act must evince a depraved mind regardless of human life. The firing of the shots by the defendant had no regard of human life. This leaves the part of the statutory essential that the act must evince a depraved mind. In State versus Weltz, 155 Minnesota 143, 193 N. W. 42, the defendant was charged with murder in the third degree. He appealed his conviction and there were presented two questions, namely,

"1. Must there be proof that one charged with third degree murder was inherently of depraved mind, or may the act and the attending circumstances be evidence enough of mental depravity?

"2. Did defendant's acts and the attending circumstances evince a depraved mind?

"The Supreme Court answered both questions in the affirmative and in its opinion stated as follows:

" 'It seems reasonably clear that the statute was intended to

formulate the doctrine of the common law that, although malice was an essential element of the crime of murder, it need not be proved directly but might be inferred from the perpetration of such an act as is described in the statute. It is a principle of universal application that a sane man is presumed to intend the natural and probable consequence of his own voluntary acts. In a moral sense the unintentional taking of human life by an act evincing a wanton and reckless disregard of life in general is less wicked than the premeditated taking of a life of a particular individual. In either case it is murder, but the statute makes a distinction as to the degree of guilt.'

\* \* \* \* \* \*

" 'A parity of reasoning leads to the conclusion that the nature of an act and the circumstances attending it may be prima facie evidence that the doer of the act was in fact a man of depraved mind. What more persuasive proof of the quality of mind can there be than the acts which the mind has prompted? If the act inevitably endangers human life, as every sane man must know, is it not in and of itself convincing proof that the doer had a depraved inclination to mischief; that he had no regard for social duty; that he was generally reckless of life, possessed, in short, of a depraved mind within the meaning of the statute.'

\* \* \* \* \*

" 'Intoxication may temporarily arouse passions and paralyze or pervert the will without depriving its victim of the power to distinguish between right and wrong and to comprehend the nature of his acts. It would seem that defendant was in that condition mentally when he ran over Mrs. Peabody.'

\* \* \* \* \*

" 'It is a fair inference from the evidence that defendant quarreled with Mrs. Walker and that liquor and the quarrel combined to excite him to the point of frenzied anger. A mind which may become inflamed by liquor and passion to such a degree that it ceases to care for human life and safety is a depraved mind. Defendant may have been beside himself with rage, but he knew

enough to start and guide his car, to fly when pursued and to seek to escape by running down the officers who tried to intercept him.'

\* \* \* \* \*

"It has been observed that the defendant was suffering from a mental disturbance when she went to the apartment and that this mental disturbance became greater when she saw the bed. The expert for the State testified on cross examination that the word 'depraved' could mean automatically out of touch with ordinary standards of decency and reality. I am satisfied by the required degree of proof that the acts and circumstances contained in the record evince a depraved mind in the defendant as that term is used in the statute.

"The last statutory essential is that the act was committed on March 14, 1968, in Ramsey County, Minnesota. There is no question that this is the time and place of the alleged act.

"Based on the foregoing I find the defendant guilty of murder in the third degree."

A mind which has become inflamed by emotions, disappointments, and hurt to such degree that it ceases to care for human life and safety is a depraved mind. Defendant may have been emotionally disturbed but she knew enough to board a plane in Chicago under a fictitious name, fly to St. Paul, take a gun with her, take a cab to the St. Paul Bus Depot, change cabs and travel to the Pulford apartment, shoot both Pulford and his wife, and then to escape, take a cab back to the depot, and, to avoid detection, take another cab to the airport. The trial court was justified in finding that defendant was guilty of something more serious than culpable negligence, and that her acts evinced a depraved mind in the sense in which that term is used in the statute defining murder in the third degree.

We therefore conclude that the evidence in this case amply supports a conviction of third-degree murder.

Affirmed.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.