**STATE of Minnesota, Respondent,**

v.

**Roy Eric WAHLBERG, Appellant.**

**No. 48104.**

Supreme Court of Minnesota.

Aug. 8, 1980.

---

C. Paul Jones, Public Defender, and Robert E. Oliphant and Allen Christy, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan L. Mitchell, County Atty., and John E. DeSanto, Asst. County Atty., Duluth, Mark S. Rubin, Asst. County Atty., Virginia, for respondent.

Heard before OTIS, ROGOSHESKE and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Defendant was convicted, after a jury trial, in St. Louis County District Court of the first-degree murder of Jeffrey Goedderz and was sentenced to life imprisonment. On appeal he challenges the sufficiency of the evidence, the refusal of the trial court to submit the lesser included offense of murder in the third degree, the trial court's instruction on voluntary intoxication, the requirement that he present evidence of voluntary intoxication that negates the existence of a necessary mental state, improper comments of the prosecutor, the admission of impeachment evidence without a limiting instruction, and the refusal of the trial court to grant a mistrial due to mid-trial newspaper publicity. We affirm.

1. The first and crucial issue for our consideration is whether to sustain defendant's conviction. The State was required to prove that the defendant killed Jeffrey Goedderz with premeditation and intent. Minn.Stat. § 609.185 (1978). In a case such as this one, based on circumstantial evidence, the conviction may stand only where the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt. *State v. DeZeler*, 230 Minn. 39, 52, 41 N.W.2d 313, 322 (1950). This court's scope of review on appeal is limited to considering the evidence and determining whether the jury could reasonably find the accused guilty of first-degree murder. We must view the evidence in the light most favorable to the State and must assume that the jury believed the State's witnesses and disbelieved everything which contradicted their testimony. *State v. Thompson*, 273 Minn. 1, 36, 139 N.W.2d 490, 515 (1966), *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

Because the case rests on circumstantial evidence, it is necessary to set forth the facts in some detail.

On the afternoon of March 14, 1975, the body of Jeffrey Goedderz, 19, was found locked in the trunk of his car. The car, a Plymouth Gold Duster, was in the parking lot of the "co-op" store in Ely, Minnesota. It had apparently been in the same spot in the parking lot since at least 10:00 or 10:30 a. m. on March 9, 1975. All of the car's doors were locked. Goedderz's wallet was not missing.

The autopsy revealed that the cause of death was blood loss from multiple wounds. There was a wound 2¾ inches long on each side of the head which fractured the skull and bruised the brain. A massive, gaping wound, which went from the back of the neck around to the right side, cut the muscles of the neck down to the backbone, cut the mastoid bone and the skull, and penetrated the brain. The pathologist believed these wounds were caused by a sharp weapon used with considerable force. There were also large cuts on the left side of the face and neck, one of which broke the jawbone and two teeth. In the opinion of the pathologist, these wounds were probably caused by a double-edged knife applied with great force. In addition, various lacerations, bruises, and cuts were found which, according to the pathologist's testimony, were incurred when Goedderz was trying to defend himself from attack.

Based on analysis of stomach contents, the pathologist testified that Goedderz could have died any time between 4 a. m. and 10 a. m. on March 9, 1975, but that there was an 85% probability that he died before 8 a. m. that day. The pathologist concluded that two weapons were probably used, a double-edged knife and an instrument with a broad, flat blade.

Defendant, who was 23 years old at the time of the offense, lived with his parents in Ely. His parents owned the Ely Dairy, which defendant had been managing for about a year. Defendant's friends described him an an "average guy," a peaceful person who avoided fights. Roxanne Ahlstrand, defendant's girlfriend, testified that when he was not on drugs he was peaceful and easy to talk to, but that he was an altogether different person when he was on acid.

Roxanne Ahlstrand testified that she and her sister, Brenda, were driving around Ely drinking beer on the evening of March 8, when they saw defendant and picked him up. He told them that he had "dropped two hits of acid" before leaving home. Roxanne testified that he was giggling and "acting a little funny." He said he wanted to "drop two more hits" of acid. Roxanne saw him take a small bottle out of his pocket and put something in his mouth. Another friend who was in the car testified that she saw defendant put acid into his mouth at this time. The three of them then went to a party at 7:30 p. m., where the defendant drank mixed drinks for approximately three hours.

Brenda Ahlstrand testified that she and defendant left the party together. At approximately 11:45 p. m., Brenda sent defendant into the "Legion" bar to look for her boyfriend. He was in the "Legion" for about 10 or 15 minutes, and when he returned he said he could not find her boyfriend and that he had been in a fight in the bar. She did not observe any cuts on him, but it was dark in the car. During the six hours she was with him, Brenda testified, defendant never became loud or boisterous, never lost his temper, and never stumbled or slurred his speech.

The owner of the "Legion" bar testified that defendant came into the bar around 12:40 p. m. but that no fight ensued. The bartender testified that defendant did not appear noticeably intoxicated while he was in the "Legion."

Roy Tuomala, defendant's third cousin, was sleeping in the apartment of Cynthia Leppanan Teller on the evening of March 8. At approximately 5 a. m. on March 9, Tuomala and Teller heard people running up the stairs and pounding on the apartment door. Tuomala answered the door and saw Red Nelson, Richard Murto, defendant, and Goedderz. He testified that they were drunk and told him they were looking for a party. He told them there was no party at the apartment and went back to bed. He

heard the group open the refrigerator in the kitchen, looking for beer, and then leave five or ten minutes later.

Terry Gfeller testified that he was living at the Wolf Lake Resort 10 miles west of Ely on March 9 and that when he went out to warm up his truck between 6:15 and 6:30 a. m. he saw a Gold Duster drive very slowly down the loop road and stop. He saw the driver, whom he later identified as Red Nelson. He could not see if others were in the car. He drove up behind the Duster and followed it for a while as both vehicles headed east toward Ely. Gfeller drove into the Holiday Station in Ely about 7:10 a. m. and bought a pie, and when he went back out to his truck he saw the same Duster in the pump area of the station. He saw the driver standing by the car but was unable to see if anyone was inside the car. Just as Gfeller left, he saw the Duster head east outside the city limits of Ely at about 7:15 a. m.

Robert Owens, manager of the Holiday station, who knew the defendant because he delivered dairy products to his store regularly, testified that shortly after 7 a. m. on March 9, the defendant arrived at the Holiday station in a Gold Duster. The manager thought that two others got out of the car, but he remembered that defendant got out from the passenger's side. Defendant came in and conversed with the manager for a while. The manager did not notice any cuts or bruises on him. The car in which defendant had arrived was filled with approximately one dollar's worth of gas at the Holiday station.

Roxanne Ahlstrand testified that the defendant came to her apartment about 9:20 a. m. on March 9. She said he appeared tired, shaky, nervous, and hung over. She noticed a tiny bruise on the bridge of his nose and a tiny cut or crack on his lip. There were two small cuts or scratches on his left hand. She noticed that his appearance had changed from the night before, when she and her sister were with him at the party. He now had on his dress jeans instead of his work jeans, and he was no longer wearing the flowered shirt he had worn the previous night.

Defendant came in and lay his head on Ms. Ahlstrand's lap for a while. He then went into the bedroom, took his clothes off, and went to bed. She noticed that his long underwear was damp from the knees down and that there was a hole in the knee. Defendant told her he got wet wading through the snow. He also told her he thought he had been in a fight at the "Legion" and that Red Nelson had been with him. It was not until just before Ms. Ahlstrand's first interview with the police that defendant called her and told her he was with Goedderz the night Goedderz died but that he had nothing to do with the crime.

Defendant testified that on the evening of March 8 he took a couple of "hits" of LSD before going to a party with Roxanne and Brenda Ahlstrand. At the party he drank strong mixed drinks, one after the other. He testified he was really "loaded" when he left the party and had trouble maneuvering the steps. After spending several hours with Brenda Ahlstrand, he and "Red" Nelson and Rich Murto drove around together, drinking beer. While they were driving, a car flashed its lights at them, so defendant pulled over, got out, and talked to the driver of the car. The driver smiled at him, showed him a bottle of banana liqueur, and asked defendant if he wanted to get into his car and help him drink it. Defendant later found out that that person was Jeffrey Goedderz. He had never met Goedderz before that night.

Richard Murto, Red Nelson, and defendant joined Goedderz in his car, and they drove around the area. Goedderz was driving at this time. As they drove, they all drank the banana liqueur, and Goedderz told them about a girl named "Liz," whom he had met that night. They drove by the girl's home and then to Red Nelson's house for vodka. The group decided to get some beer at Cynthia Leppanan Teller's apartment. All four went into the apartment when Roy Tuomala answered the door. They opened the refrigerator and took all the beer that was there. The group eventually drank all of the beer.

The four then went to the Wolf Lake Resort area, looking for beer. Red Nelson drove, Goedderz sat in the front seat, and defendant and Rich Murto were sleeping in the back. When they got back into town, defendant and Murto woke up, and they dropped Murto at his home. Goedderz said he wanted to check on his girlfriend once more and get some gas, so they pulled into the Holiday station. Defendant got out of the car and remembered he might have to deliver milk that morning, so he went into the store and talked to the manager. When he got back out to the car, he noticed that Goedderz was now in the driver's seat. It was defendant's testimony that he wanted to go home at this point, so Goedderz dropped him and Nelson off at defendant's truck at "Zup's" parking lot. Goedderz drove away in the Duster, and defendant did not see him again. At trial, he estimated that Goedderz dropped them off at approximately 7:30 a. m. In earlier statements to the police, he estimated the time Goedderz left him at 8:15 a. m.

Defendant testified he took Nelson home and then drove home, where he took out his contacts and snorted some speed to wake up. He then drove to Roxanne Ahlstrand's apartment. He did not remember what was said in the apartment; he could only remember going to bed. He could not remember how he got the cuts on his hands and face.

Defendant testified that his relationship with Goedderz was very good, and he denied hitting or killing him. He testified he did not know who killed him. Neither Red Nelson nor Rich Murto testified at the trial.

According to defendant's testimony, he started sneaking drinks from his parents' liquor cabinet while still young. For the last four or five years he had been drinking hard liquor every day. He also took amphetamines or hallucinogens. LSD was the predominant drug that he ingested. His habit was to take both drugs and alcohol together. He stated that he had taken drugs and alcohol before testifying before the grand jury.

A psychologist and a psychiatrist testified that, based on an interview with the defendant, his history, a personality test administered to him in August 1972, and one administered in April 1977, defendant is chemically dependent. The psychiatrist also concluded that the defendant appeared to have been intoxicated with drugs and alcohol on March 8 and 9, 1975, and that it was possible he might have been so intoxicated as to have suffered impairment in thinking and behavior. The professionals also indicated that their tests showed defendant had a tendency to react to stress by acting out physically, a hostility toward authority, and a tendency to feel persecuted.

Three members of the grand jury who indicted the defendant testified that he did not appear intoxicated at the time he testified. Floyd Bowman of the Minnesota Bureau of Criminal Apprehension testified that defendant had never appeared under the influence of drugs or alcohol when he was being interviewed by the police. Cynthia Teller testified that usually the defendant was not violent when on drugs but was happy and bubbly.

Theresa Rozman testified that, in late March or early April 1975, defendant told her, "You wouldn't believe what happened that night." In the summer of 1975, according to the testimony of Conrad Karasti, defendant told Karasti that he had seen someone chopped up who was a "snitch."

A great deal of evidence was presented concerning statements made by the defendant to the police or others, which were shown to be false or inconsistent with the testimony of other witnesses at trial. Defendant admitted at trial that he had lied to the police about some things and that he had lied to the grand jury too. There was also evidence that he had encouraged some of his friends to lie for him.

On April 13, 1975, a hatchet was found on a county road east of town. In the vicinity where the hatchet was found, tapes, the tape player and speaker from Goedderz's Gold Duster were also found. The hatchet was 14 inches long, with a black rubber handle and a leather case over the axe head.

Traces of human blood were found on the hatchet. The State's expert witness testified that the hatchet was "consistent" with having made Goedderz's scalp wound and could have been one of the murder weapons.

During defendant's questioning by the police, he had given Agent Bowman a knife. Although no blood or hairs had been found on the knife, the State's expert testified that the double-edged knife belonging to defendant was consistent with several of the victim's wounds, and thus the knife could be one of the murder weapons.

Roxanne Ahlstrand testified that after the police asked her about a hatchet, she remembered that Red Nelson had stolen a hatchet from Gibson's, a local store, a few months earlier and had thrown it under the seat of defendant's truck. After her interview with police, she checked for the hatchet, and it was gone. She mentioned this to defendant, who told her not to worry, that the hatchet was at his home all "clean and shiny." Later, defendant asked her if she was the one who had told the police he had a hatchet under his truck seat. When she said "yes," he put his head down in his hands and said, "oh great!" He told her to go back and tell them it was a machete, not a hatchet. At another time, she asked to see the hatchet, but he told her he did not know where it was. She described the hatchet as being 12 inches long, made of stainless steel, with a leather case. She said it did not have a black handle. At trial, she was shown the hatchet on which blood had been found, and she testified that she was positive that hatchet was not the one she saw in defendant's trunk.

Cynthia Leppanan Teller testified that she had seen a hatchet in the defendant's car some time between the middle of November 1974 and February 1975. The hatchet was on the back ledge, but she had moved it under the front seat where it would be safer. She described the hatchet as having a black handle, not wood. She was shown the hatchet on which blood had been found and testified that it was the same one she had seen earlier in defendant's car.

The manager of Gibson's in Ely testified that the hatchet on which blood had been found was similar to one of the types of hatchets sold by his store at the time of the murder.

Defendant testified at trial that the knife he gave to the police was given to him by Red Nelson and that he later gave the knife to his father. The last time he owned it was Christmas 1974. He testified he did not have the knife with him on March 8 and 9. He had told the police earlier that he did not own a hatchet and had not owned one since he was a boy.

Blood samples were taken from Goedderz, defendant, and his companions. Goedderz's blood was type A, defendant's blood is type B, and Nelson and Murto have type O blood. Many areas of Goedderz's car were blood-stained, but most of the stains were blood type A. A smear on the passenger side arm rest of the car was consistent with either someone of AB blood type or a combination of blood from a type A person and a type B person. A similar smear was found on the front seat floor mat, near the center hump of the car.

■ Defendant contends there was insufficient evidence for the jury to find premeditation. "Premeditation" means "to consider, plan or prepare for, or determine to commit" the act prior to its commission. Minn.Stat. § 609.18 (1978). Premeditation must usually be inferred from all of the circumstances surrounding the homicide. *State v. Gowdy*, 262 Minn. 70, 74–75, 113 N.W.2d 578, 581 (1962). Extensive planning and calculated deliberation need not be shown; the requisite plan to commit first-degree murder can be formulated virtually instantaneously by a killer. *State v. Neumann*, 262 N.W.2d 426 (Minn.1978).

■ In *State v. Walker*, 306 Minn. 105, 120, 235 N.W.2d 810, 820 (1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976), this court held that the duration and severe brutality of the beating which caused death showed intent and premeditation beyond a reasonable doubt.

However, in *State v. Swain,* 269 N.W.2d 707, 713–14 (Minn.1978), and more recently in *State v. McCullum,* 289 N.W.2d 89, 91–92 (Minn.1979), we held that the severity and duration of a beating alone will not support a finding of premeditation. Such a finding must be justified by all of the circumstances, with due deference given to the verdict of the jury. In *McCullum,* we affirmed the conviction based on the brutality of the beating, the evidence of the decedent's break-up with the defendant, and the other facts in the case. In *State v. Campbell,* 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968), we sustained the defendant's conviction where there was evidence that he had armed himself and examined the gun to make sure it contained live ammunition.

In the instant case, the victim suffered numerous brutal blows. Viewing the evidence in the light most favorable to the State, there was evidence beyond the beating itself, however, which would support an inference of premeditation. The fact that Goedderz did not own or keep a hatchet in his car, coupled with the evidence that defendant had access to a hatchet similar to the murder weapon which two people saw in defendant's truck several weeks before the murder and that the hatchet was missing afterwards, supports an inference that defendant must have transferred the hatchet to Goedderz's car before the killing. Furthermore, the evidence that only one dollar's worth of gas was purchased for the car, even though according to defendant Goedderz planned to do further driving that morning, supports an inference that defendant may have known the car would need little gas because Goedderz was about to be killed.

■ Defendant contends that the evidence of intoxication he presented negated a reasonable finding of intent and premeditation. A defendant's state of intoxication at the time of the killing may properly be considered by the jury in determining whether he acted with intent and premeditation, but the fact that the defendant had been drinking before the killing does not raise a presumption that he was incapable of premeditation or intent. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978); *State v. Lund,* 277 Minn. 90, 151 N.W.2d 769 (1967). As long as the record contains sufficient evidence to support the conclusion reached by the jury on the intoxication issue, that conclusion will not be reversed, despite the existence of some evidence to the contrary. *State v. Neumann,* 262 N.W.2d at 431–32. In *Merrill,* the defendant told police officers that he had drunk 12 beers and ¾ pint of brandy on the night of the killing, but two of the State's witnesses testified that he did not appear intoxicated and did not act drunk. This court sustained the conviction, stating that the jury could reasonably have believed the State's witnesses, whose testimony, along with the other facts of the case, supported the jury's verdict.

Although the defendant in the instant case presented evidence of intoxication, several witnesses, including the woman with whom he spent much of the evening, testified that he did not act noticeably intoxicated. The evidence concerning the extent of defendant's activities the night of the killing could also support a finding that he was not so intoxicated that he could not intend or plan a murder.

■ Although there was little direct evidence against the defendant, the circumstantial evidence presented, and the permissible inferences the jury could have drawn from that evidence, reasonably support the jury's finding · of first-degree murder. Looking at the evidence in the light most favorable to the State, the jury could have found that defendant and two others were in Goedderz's Gold Duster at the Holiday station between 7:00 and 7:15 on the morning of March 9. They bought one dollar's worth of gas. Terry Gfeller saw the Duster head east out of town at 7:15 a. m., despite defendant's testimony to the contrary. A hatchet with human blood on it was found in an area east of town, where the tape player, tapes, and speaker from the Duster were found. A hatchet similar to the hatchet with the blood on it had been seen by two witnesses in defendant's truck sev-

eral weeks before the incident but was not there after the killing. Defendant said, "oh great!" and hid his head in his hands when he learned that his girlfriend, Roxanne, had told the police about the hatchet in his truck. He asked her to tell the police it was a machete, not a hatchet, she had seen. Defendant first told police he had left Goedderz at 8:15 a. m., but at trial he said it was at 7:30 a. m. There was an 85% probability Goedderz was killed before 8 a. m. and certainly by 10 a. m. Defendant arrived at Roxanne's apartment about 9:30 a. m. on March 9, tired, nervous, and shaky, with small cuts on his hand and face, different clothes than he had worn the night before, and underwear wet from the knees down from wading in the snow. The Duster was in the parking lot behind the co-op, where defendant could see it daily on his milk route from at least 10:00 or 10:15 a. m. on March 9. Defendant told Terry Rozman that she "wouldn't believe what happened that night," told Conrad Karasti he had seen someone chopped up who was a "snitch," and enjoyed playing "mental chess" with the police. The facts and circumstances form a complete chain, which, in the light of the evidence as a whole, leads so directly to the guilt of defendant as to exclude, beyond a reasonable doubt, any reasonable inference other than that of his guilt.

2. The defendant argues that the trial court's refusal to submit the charge of third-degree murder to the jury was reversible error because the evidence supported a finding that defendant had a "depraved mind" and did not intend to cause the death of any person. First- and second-degree murder instructions were given. In *State v. Leinweber*, 303 Minn. 414, 228 N.W.2d 120 (1975), we held that the trial court should submit instruction on a lesser degree of homicide to the jury if the evidence reasonably supports a conviction of the lesser degree and at the same time supports a finding of not guilty of the greater offense. *Accord, LaMere v. State*, 278 N.W.2d 552, 557–58 (Minn.1979).

Minn.Stat. § 609.195 (1978) defines murder in the third degree as follows:

Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree * * * :

(1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life; * * *.

This statute was intended to cover cases where the reckless or wanton acts of the accused were committed without special regard to their effect on any particular person or persons; the act must be committed without a special design upon the particular person or persons with whose murder the accused is charged. *State v. Hanson*, 286 Minn. 317, 328–29, 176 N.W.2d 607, 614–15 (1970); *See State v. Lowe*, 66 Minn. 296, 68 N.W. 1094 (1896).

This court, in *State v. Mytych*, 292 Minn. 248, 194 N.W.2d 276 (1972), sustained a conviction of third-degree murder where the defendant's shots were aimed at the decedent alone. We stated that "[a] mind which has become inflamed by emotions, disappointments, and hurt to such degree that it ceases to care for human life and safety is a depraved mind." *Id.* at 259, 194 N.W.2d at 283. However, in *Leinweber*, we noted that *Mytych* is not a typical application of Minn.Stat. § 609.195(1). 303 Minn. at 417 n. 3, 228 N.W.2d at 123 n. 3.

Recently, in *State v. Stewart*, 276 N.W.2d 51 (Minn.1979), we held that the trial court properly refused to submit to the jury the lesser included offense of third-degree murder where the victim was shot twice, there were no bullets fired at anything or anyone else, and no other person in the vicinity of the shooting was concerned for his safety.

In the instant case, the decedent suffered many brutal blows. While this fact certainly indicates a mind without regard for human life, the evidence suggests that all the blows were directed toward the victim. The inside of the car was not slashed, nor was evidence presented that any of defendant's companions in the car were concerned for their own safety. Furthermore, there was ample evidence to support

a finding of an intentional killing, whereas third-degree murder is an unintentional killing. As we mentioned in *State v. Merrill*, 274 N.W.2d 99, 105 (Minn.1978), the fact that the jury was given first- and second-degree murder instructions and came back with a first-degree murder conviction indicated that the jury believed the killing was intentional, and that failure to submit instructions on lesser offenses could not have prejudiced the defendant.

▮ 3. Defendant contends that the trial court's instruction on voluntary intoxication was erroneous and substantially prejudiced his right to a fair trial. The court instructed the jury as follows:

In this case, the defense has introduced evidence of the defendant's intoxication on March 8th and 9th of 1975. An act committed while in the state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration by the jury in determining such intent or state of mind. The burden of establishing intoxication is on the defendant. He must establish it by a fair preponderance of the evidence.

Fair preponderance of the evidence means that it must be established by a greater weight of the evidence. It must be of a greater or more convincing effect and it must lead you to believe that it is more likely that the claim of intoxication is true than that it is not true. In this regard, intoxication cannot be considered by you, the jury, unless it was of such a degree that the accused did not know what he was doing or could not distinguish the difference between right and wrong. The mere fact of a person's drinking or drug consumption does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is rendered incapable of intending to do a certain act. *A person under the influence of intoxicating liquors or drugs is presumed to know, intend and remember criminal acts which he does while so intoxicated to the extent as would a man not influenced by such intoxicants.* Minnesota Statute 340.961, entitled, "Drunkenness in a Crime," reads, in part, as follows: "No person shall be charged with or convicted of the offense of drunkenness or public drunkenness. Nothing herein shall prevent the prosecution and conviction of any intoxicated person for offenses other than drunkenness or public drunkenness." (Emphasis added.)

Defendant contends that the sentence emphasized above in effect eliminates the defense that voluntary intoxication can negate a defendant's intent to commit murder. Even though the instruction was not objected to at trial or raised in the motion for a new trial, this court may grant a new trial if an error of fundamental law causing substantial prejudice is shown. *Cf. State v. Keaton*, 258 Minn. 359, 365, 104 N.W.2d 650, 656 (1960).

▮ The trial court's instructions were correct, except for the sentence about which defendant complains. The mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is incapable of intending to commit a certain act. *State v. Lund*, 277 Minn. 90, 151 N.W.2d 769 (1967). The burden of establishing intoxication by a fair preponderance of the evidence is on the defendant. *State v. Corrivau*, 93 Minn. 38, 44, 100 N.W. 638, 640–41 (1904).

▮ The incorrect sentence in the court's instruction could not, however, have materially prejudiced defendant's rights. Ample evidence was presented to support a jury inference that defendant knew what he was doing at the time of the killing. Even his psychiatric experts could say no more than that it was *possible* that he was so intoxicated that his thinking was impaired. Evidence of defendant's guilt was strong. Moreover, the sentence complained of was only a small part of the entire instruction on voluntary intoxication, and there is no evidence that the jury was confused. Furthermore, defendant's evidence

of voluntary intoxication was not his sole defense; the major thrust of his testimony was that he did not kill the victim. *See State v. Hill*, 256 N.W.2d 279 (Minn.1977). Under these circumstances, the error was not reversible.

4. Defendant argues that Minnesota law, putting the burden on the defendant to show that his intoxication negated the intent to commit the crime, violates due process under the United States Supreme Court decisions of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), and *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

In *Mullaney v. Wilbur*, the United States Supreme Court held that Maine law, requiring the defendant in a murder prosecution to prove that he acted in the heat of passion on sudden provocation in order to reduce the charge of manslaughter, violated due process. *Mullaney* was clarified in *Patterson*, where the court held that due process was not violated by a New York law requiring the defendant to prove the affirmative defense of "extreme emotional disturbance." The court explained that *Mullaney* held that a state must prove every element of an offense beyond a reasonable doubt and that it may not shift the burden of proof to the defendant by presuming any element upon proof of the other elements of the offense. Such a shifting of the burden of persuasion with respect to a fact which the state deems so important that it must either be proved or presumed is impermissible under due process. 432 U.S. at 215, 97 S.Ct. at 2329. The state law in *Patterson* was valid, however, because the state was required to prove each element of the crime, and no elements were inferred or presumed. It is permissible to require the defendant to prove the separate issue of his affirmative defense in order to mitigate the degree of criminality or punishment. *Id.* at 207–09, 97 S.Ct. at 2325–26. This court, following *Patterson*, recently held that requiring the defendant to prove his insanity by a preponderance of

the evidence does not violate due process. *State v. Carpenter*, 282 N.W.2d 910, 914 (Minn.1979).

In *Sandstrom v. Montana*, the Supreme Court held that an instruction to the jury that the law presumes that a person intends the ordinary consequences of his voluntary acts violates due process in a case where intent is an element of the crime charged. This is because a reasonable juror hearing the instruction could assume that the ultimate burden of persuasion on the issue of intent was on the defendant, and therefore the instruction would have the effect of relieving the state of the burden of proving intent beyond a reasonable doubt. 442 U.S. at 524, 99 S.Ct. at 2459.

In the instant case, we are convinced that the State proved every element necessary to convict the defendant of murder in the first degree beyond a reasonable doubt. The defendant presented evidence that he was chemically dependent and intoxicated at the time of the offense, and the State called several witnesses in rebuttal who testified that the defendant did not act or appear intoxicated at various times. As in situations where the defendant raises an affirmative defense, although the burden rests on the defendant to present evidence of intoxication, the ultimate burden of proving intent remains with the State. The jury verdict indicates that this burden was met.

5. Defendant next argues that he was denied a fair trial because the prosecutor improperly stated during closing argument that the knife and the hatchet that were introduced into evidence were the actual weapons used in killing Goedderz, that defendant transferred the hatchet and knife into Goedderz's car, and that the psychologist and the psychiatrist who testified on defendant's behalf were paid to give a diagnosis favorable to defendant.

Counsel have the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom. *Connolly v. The*

*Nicollet Hotel*, 258 Minn. 405, 419–20, 104 N.W.2d 721, 732 (1960). The prosecutor's remarks regarding the murder weapons and their transfer to the victim's car were permissible inferences to be drawn from the evidence presented in the case.

■ The prosecutor's remarks concerning the psychiatrist were improper. They were not justified by the evidence. Furthermore, in *Lamont v. Independent School Dist. No. 395*, 278 Minn. 291, 154 N.W.2d 188 (1967), this court held that it was improper for plaintiff's counsel to characterize one of the defendant's doctors as a professional witness who would testify in a predetermined manner for money, precisely what the prosecutor did in the instant case.

■ Whether a new trial should be granted because of misconduct of the prosecuting attorney is governed by no fixed rules but rests within the discretion of the trial judge, who is in the best position to appraise its effect. The court's determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that defendant's right to a fair trial was denied. *State v. Collins*, 276 Minn. 459, 477, 150 N.W.2d 850 (1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968).

In final instructions, the trial court told the jury that the remarks of the attorneys were not evidence and that they must rely on their own recollection of the evidence. The jury was instructed to disregard the prosecutor's reference to the fact that the psychiatrist was paid to reach a certain conclusion. The prosecutor told the jury at the outset of his closing argument that his remarks were not evidence, and defense counsel in his closing argument repeatedly discussed the comments of the prosecutor which he deemed improper and unwarranted by the evidence. In the order and memorandum in response to defendant's motion for a new trial, the trial court stated that the remark regarding the psychiatrist was improper but that no prejudice resulted. Under these circumstances, we find no reversible error.

6. Defendant objects to the trial court's allowance of certain impeachment evidence without giving a limiting instruction to the jury. In order to impeach several of defendant's statements to the police, the State introduced evidence of a drug transaction involving defendant. Defendant objected to the introduction of such evidence because there was no *Spreigl* notice and the evidence did not fall into any of the exceptions for exclusion of evidence of other crimes. The court overruled the objection. Defendant did not request a limiting instruction, and the court did not give one at that time. In final instructions to the jury, the court did instruct the jury that impeachment evidence was to be used by them only to judge credibility.

■ It would have been better, in the instant case, had the trial court given a limiting instruction *sua sponte*, but its failure to do so is not reversible error where, as here, defense counsel did not request one. *State v. Forsman*, 260 N.W.2d 160, 169 (Minn.1977); *State v. Daml*, 282 Minn. 521, 162 N.W.2d 240 (1968). The court did give a limiting instruction at the end of trial. Moreover, even if the jury used the evidence for purposes other than impeachment, the error was not prejudicial, since the jury was already aware of defendant's involvement with illegal drugs and the evidence of defendant's guilt was strong. *See Syrovatka v. State*, 278 N.W.2d 558 (Minn. 1979).

7. Finally, defendant contends that the trial court erred in denying his motion for a mistrial due to newspaper publicity during the trial. On May 4, 1977, during the course of the trial, several articles appeared in the Ely Echo newspaper which commented on the trial and contained quotes from the trial judge, the prosecutor, and relatives of Jeffrey Goedderz. Defendant moved for a mistrial on May 5, but his motion was denied by the court. The court pointed out that the jurors had already been cautioned twice not to read anything about the case, once as each was selected, and again as an entire panel when the trial

began. The court was convinced that none of the jurors had seen the article. The judge did offer, however, to poll the jury to determine whether any of the jurors had read the articles, but defense counsel declined the offer. In addition to cautioning the jury at the beginning of trial not to read anything about the case or to discuss it with anyone, the court cautioned the jury to this effect at least twice during the trial and in his final instructions. Defendant concedes in his brief that none of the jurors lived in Ely.

The fact that a juror may have read a newspaper article discussing certain aspects of the case will not furnish the basis for a new trial unless it appears (1) that the juror read the article and was influenced to the prejudice of the defendant, and (2) that the defendant requested appropriate action by the court. If, having knowledge of the alleged misconduct, the defendant chooses nevertheless to proceed with the trial to completion, it must be held that he has waived the irregularity. *State v. Thompson*, 273 Minn. 1, 33, 139 N.W.2d 490, 513 (1966), *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966); *State v. O'Donnell*, 280 Minn. 213, 219–20, 158 N.W.2d 699, 703 (1968).

In the instant case, defendant failed to poll the jury and has made no showing that the jury saw or read the article or was actually prejudiced against him as a result. Therefore, the defendant has waived his right to complain of the articles on appeal. In any event, the jury was instructed numerous times during the trial not to read anything about the case.

Affirmed.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.