**STATE of Minnesota, Respondent,**

v.

**Frank POPPY, Jr., Appellant.**

**No. C8–85–1416.**

Court of Appeals of Minnesota.

April 15, 1986.

Review Denied June 13, 1986.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Gerald Wilhelm, Martin Co. Atty., Fairmont, for respondent.

C. Paul Jones, Public Defender, Marie Wolf, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by WOZNIAK, P.J., and LANSING and HUSPENI, JJ., with oral argument waived.

## OPINION

LANSING, Judge.

A jury convicted Frank Poppy, Jr. of attempted first-degree murder and first-degree assault of Irene Poppy, his estranged wife. *See* Minn.Stat. §§ 609.185, subd. 1; 609.17; 609.221; and 609.11, subd. 5. He was sentenced to a term of 70 months with a minimum term of 36 months. Appellant contends that the evidence supporting the conviction is insufficient as a matter of law because his intoxicated condition prevented him from forming the intent necessary to commit either crime. We affirm the convictions.

## FACTS

Irene Poppy was shot in the face at approximately 12:30 a.m. on April 7, 1984. The bullet was fired from 6–8 inches behind the glass window of the door at which she was standing. It struck her in the left cheek, above the corner of her mouth, fractured several teeth, and lodged near her cheek.

Steven Parnell, the physician who treated her, examined the gunshot wound and, with the aid of x-rays, located and removed the major bullet fragment. Parnell traced the path of the bullet with a surgical probe and determined from the bullet's entry point, the x-rays, and the probe that the original trajectory for the bullet was directly toward the base of the brain. If the bullet had not been deflected when it fractured a back molar, it would have struck the base of Irene Poppy's brain and caused instantaneous death.

The shooting occurred in the entrance of an enclosed porch on her parent's farmhouse in rural Trimont, Minnesota. Irene Poppy said that as she was preparing to go to bed at 10 p.m., she let the dogs out the back door, but they did not run all over the yard as they normally did. Instead, they stayed on the porch, watching the mobile home. She saw no lights or anything unusual and went to bed.

She was awakened a few hours later by barking dogs. She went to the porch and pulled aside the curtain of the back door. She saw a light in the mobile home where she and appellant had lived before he left for California three months earlier. Out of the corner of her eye she saw appellant standing against the side of the house. He turned and looked at her, and she ran to the dining room to telephone the sheriff. She was frightened and concerned for the safety of her elderly parents, the Carlsons, whom appellant had threatened to kill. As she picked up the telephone she saw appellant kicking out the bottom panel of the back door and she ran back to the door, again pulling the curtain aside. As she stood there, she felt something hit her face and knew that she had been shot. She ran back to the phone and called the sheriff. Ten minutes later police arrived, and she was taken by ambulance to the emergency room of the Fairmont Hospital.

Appellant testified that he left California on April 4 and drove to Wells, Nevada. The next day he drove to Pines Bluff, Nebraska. When he left Nebraska on the morning of April 6, he had five cans of beer in the ice chest in his pickup. Between 2 and 3 p.m., he ate a sandwich and drank one beer. He stopped at a rest area about 5 p.m. and had another beer. He stopped around 8 p.m. in Sioux Falls, South Dakota, and bought a twelve-pack of beer and a pint of blackberry brandy. Appellant testified at trial that he did not consume any alcohol while driving, but he told Patrick Shannon, the BCA investigator who took appellant's statement the day after the shooting, that he started drinking in the truck right after he purchased the beer.

According to appellant, he arrived at the farm between 10 and 10:30 p.m. He parked his pickup in front of the machine shed, down the road from the mobile home and the farmhouse. He left the truck and walked down the road toward the mobile home. He entered the mobile home and turned the lights on. He walked from room to room, checking the furniture.

Appellant moved his pickup from the machine shed to an area behind the corn crib. He said that he moved it behind the corn crib because he intended to sleep in the back of the truck that night, and the building shielded the truck from the yard light. The truck could not be seen from the farmhouse.

After moving the pickup, appellant sat in the cab and drank five cans of beer and an unspecified amount of blackberry brandy. Although his statements to police and his trial testimony are not consistent on the point at which his memory stops, he testified that he remembers nothing after he began drinking heavily.

After the shooting the police found appellant in the mobile home lying on a bed with a .22 caliber revolver near his hand. He had shot himself in the head. Appellant testified that he had had the gun for a number of years and that it had been loaded for some time. He brought the loaded gun from California in a suitcase. A ballistics expert from the Minnesota Bureau of Criminal Apprehension (BCA) testified that the revolver was used to shoot Irene Poppy. Another BCA expert testified that pieces of glass removed from appellant's boots were from the door which had been fired through.

Deputy Sheriff James Clover detected an odor of alcohol on appellant's breath but said that his speech was coherent and not slurred. Appellant told him to "tell Irene I'm sorry." Appellant complained that his head hurt and the handcuffs were too tight. Ron Beckius, a Sherburne police officer who was at the scene, did not smell alcohol but did not get closer than 10 feet from appellant. He believed appellant said "I'm sorry for shooting Irene," or "I'm

sorry I shot Irene." Brian Hansen, the emergency medical technician who accompanied appellant in the ambulance to the hospital in Trimont, also detected alcohol on his breath. Before appellant was transferred to St. Mary's Hospital in Rochester, he asked Hansen to "tell everybody I'm sorry." In the bedroom where appellant was found the officers discovered a note that said "Irene, why did you ever cause this to happen" and "[s]ay hello to my mom and I hope you people are satisfied now that you have me gone."

Later that morning Deputy Sheriff Kenneth Schweiger retrieved a pint bottle of blackberry brandy from the mobile home. The bottle was two-thirds full. Brian Carlson, Irene Poppy's nephew, retrieved an empty beer can from the trailer, three to five empty beer cans from the garage, and saw a couple of empty beer cans in a sack in the hoghouse. An alcohol analysis was performed on a blood sample obtained from appellant but it was not offered as evidence because the nurse who drew the blood prepared appellant's arm using an alcohol swab that would invalidate the blood alcohol reading.

Appellant and Irene Poppy each testified that appellant was a heavy drinker. He drank moderately at the time of their marriage in 1963, and his daily consumption of alcohol increased with time. Although there were short periods of abstinence, it was not uncommon for appellant to drink a case of beer (24 bottles) in one day. The beer was usually accompanied by shots of brandy or vodka. Appellant apparently developed a tolerance for large amounts of alcohol because, although he had fallen a few times, he claimed only one previous alcoholic memory loss, around the time of his father's death. Irene Poppy testified that she knew of no memory losses appellant had suffered from drinking.

Appellant's increased drinking caused problems in their marriage. They also argued about religion. Appellant, a Pentacostalist, disapproved of Irene Poppy's conversion to Jehovah's Witnesses. Irene Poppy testified that during their marriage appellant had threatened her with a firearm, struck her, and at least once knocked her out. Appellant denied striking her.

In January 1984, appellant moved to California to stay with his mother. While in California, appellant wrote Irene Poppy a number of letters addressed to "Unfaithful," "Blasphemer," "Biblical Hypocrite," and "Misunderstanding." She kept some of the letters, and they were introduced into evidence at trial. In the letters, appellant called her a "pig," and accused her of infidelities. In a letter dated February 24, 1984, he wrote, "If I were you, I would stay on guard because you can never know who is out there but you don't have to worry about it being me." At trial, appellant testified that he remembered writing some of the letters but that he was drinking when he wrote them and he did not recall finishing the threatening or abusive letters.

Appellant also telephoned Irene Poppy frequently during his absence. A month before the shooting appellant called threatening to kill her with his .303 if she didn't send him $4,000. He said he would kill her father while she watched, then kill her mother while she watched, then kill her, and finally kill himself. Appellant said that he could get away with anything.

The next day appellant telephoned twice. He wanted money and again threatened to kill her if she didn't send it. Irene Poppy was frightened by these two calls and wrote down the dates. He called her again two days later.

Irene Poppy contacted an attorney and the police about obtaining protection from appellant. The police gave her equipment to record his threatening phone calls. She recorded three later calls from him, which the jury heard during trial. In one recorded call, appellant said "You're going to be a dead son-of-a-bitch." In another, he told her, "You can kiss your ass good-bye." Appellant acknowledged that the voice on the tape sounded like his, but claimed he did not remember making the calls.

In March 1984 Irene Poppy began divorce proceedings and obtained a restrain-

ing order to keep appellant from entering her parents' farm. A hearing was scheduled for April 9, 1984. The papers were served on appellant in California. Appellant testified that he left California to attend the hearing in Minnesota and to persuade his wife to reconcile.

At trial appellant neither admitted nor denied his involvement in the shooting or his own gunshot wound. He said he could not recall anything that happened after he began to drink heavily approximately an hour and a half before the incident. Irene Poppy identified appellant as the person who shot her.

## ISSUE

Does the evidence conclusively show that Poppy's intoxicated condition prevented him from forming the intent to commit attempted first-degree murder and first-degree assault?

## ANALYSIS

Appellant's conviction of attempted first-degree murder must be supported by a finding that he acted "with premeditation and with intent to effect the death" of Irene Poppy. *See* Minn.Stat. § 609.185(1) (1984). Premeditation, defined by statute, means to consider, plan, or prepare for or determine to commit the act referred to prior to its commission. Minn.Stat. § 609.-18 (1984). The jury must also have found that appellant intentionally inflicted harm on his wife in order to find that he committed first-degree assault. *See* Minn.Stat. § 609.02, subd. 10(2) (1984). The jury was instructed that appellant had the burden of proving his intoxication by a fair preponderance of the evidence, but the State was required to show beyond a reasonable doubt that appellant had the intent required as an element of each offense. *See* Crim. JIG § 7.03 (2d ed. 1985); *State v. Wahlberg,* 296 N.W.2d 408 (Minn.1980).

■ Viewing the evidence in the light most favorable to the State, we believe the jury's findings on intent and premeditation are supported. The consistent pattern of threats in appellant's letters and phone calls shows he considered shooting or harming his wife. That he actually carried out his threat to shoot her and then himself suggests a determination to commit the crime. The jury could reasonably believe that appellant's possession of the loaded pistol showed preparation for the shooting.

Appellant's actions on the night of the shooting also provide evidence of intent. Although he testified that he parked the pickup to shield it from the yard light, the jury could have found that he parked the pickup where it could not be seen from the farmhouse as part of a surreptitious entry and presence on the Carlson farm. Appellant's movement alongside the farmhouse immediately before the shooting also supports a conclusion that he continuously concealed his presence. It was apparently a matter of luck that the shot he fired at Irene Poppy did not instantly kill her. The evidence is sufficient for the jury to conclude that appellant intended and attempted to kill Irene Poppy.

■ This evidence is also sufficient to support the jury's finding that he intended to assault her with the gun. When appellant arrived at the farm the gun was in his suitcase in the back of the pickup. Appellant had to go to the back of the truck, open the tailgate, pull out the suitcase, and take the gun out of the suitcase. These acts could be viewed as purposeful and intentional.

■ The evidence of intoxication does not negate the jury's finding of premeditation and intent. Appellant's testimony was the strongest evidence in support of the intoxication defense. He testified that he could not remember anything between the time he started drinking heavily and the time he woke up in the hospital. He did testify to acts on the farm *before* he started drinking, such as moving the truck and going into the mobile home. His testimony was impeached, however, by the statement he gave to Patrick Shannon that he remembered nothing from the time he *arrived* at the farm until he woke up at the hospital. The determination of credibility, reliability,

and weight to be given to the testimony of the witnesses is for the jury.

The direct evidence of appellant's alcohol consumption shows he drank one-third of a pint of blackberry brandy and four or five beers over a one and one-half hour period. The circumstantial evidence suggests that appellant consumed additional beer. Several witnesses testified that they smelled alcohol on his breath. However, the jury could find that this much alcohol is not enough to intoxicate a person of appellant's drinking capacities to a point of inability to form intent. Two officers testified that appellant spoke coherently and that his speech was not slurred. On these facts we cannot find, as a matter of law, that appellant's intoxication rendered him incapable of forming the intent to commit attempted first-degree murder and first-degree assault.[1]

## DECISION

Affirmed.

---

1. In *State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978), the defendant told police officers that he drank 12 beers and three-fourths of a pint of brandy on the night of the killing. Two of the State's witnesses testified that he did not appear intoxicated. The court sustained the conviction, saying the jury could reasonably have believed the State's witnesses.